AO 241
(Rev. 06/13)



Page 2

MAR 1 4 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
 DEPUTY CLERK

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: | |
|---|---|---|

Name (under which you were convicted):

Quinton Joey Watts          2 1 6 - CV - 0 5 4 0    CMK HC

Docket or Case No.:
CR 50607

| Place of Confinement: | Prisoner No.: |
|---|---|
| North Kern State Prison | F-78495 |

Petitioner (include the name under which you were convicted)

Quinton Joey Watts

Respondent (authorized person having custody of petitioner)

v.    Kelly Santoro   Warden (A)

The Attorney General of the State of:

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   Superior Court of the State of California

   County of Colusa

   532 Oak Street          Colusa, California 95932

   (b) Criminal docket or case number (if you know):    CR50607

2. (a) Date of the judgment of conviction (if you know):    October 8, 2009

   (b) Date of sentencing:    November 4,

3. Length of sentence:    26 year and 4 months 85%

4. In this case, were you convicted on more than one count or of more than one crime?  ☒ Yes   ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case:    11 counts of vehicular

   manslaughter and 21 of the special allegations

6. (a) What was your plea? (Check one)

   ☒ (1)  Not guilty        ☐ (3)  Nolo contendere (no contest)

   ☐ (2)  Guilty            ☐ (4)  Insanity plea

AO 241
(Rev. 06/13)

Page 3

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? _____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

    ☒ Jury   ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

    ☐ Yes  ☒ No

8. Did you appeal from the judgment of conviction?

    ☒ Yes  ☐ No

9. If you did appeal, answer the following:

(a) Name of court: _Third appelLate disTricT; CourT of appeals; CounTy of Sacramento_

(b) Docket or case number (if you know): _C063651_

(c) Result: _Denied_

(d) Date of result (if you know): _6/14/2011_

(e) Citation to the case (if you know): _n/A_

(f) Grounds raised: _prosecutorial MisconducT; ineffecTive assistance of CounseL_

_____

_____

_____

_____

_____

(g) Did you seek further review by a higher state court?  ☒ Yes  ☐ No

If yes, answer the following:

(1) Name of court: _Supreme courT of The sTaTe of CaLifornia_

(2) Docket or case number (if you know): _C063651_

(3) Result: _Denied_

(4) Date of result (if you know): _n/A_

AO 241
(Rev. 06/13)

Page 4

(5) Citation to the case (if you know): _n/A_

(6) Grounds raised: _Prosecutorial misconduct, ineffective assistance_
_of counsel_

(h) Did you file a petition for certiorari in the United States Supreme Court?   ☐ Yes   ☒ No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?   ☒ Yes   ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _Superior Court of The state of California_

(2) Docket or case number (if you know): _CV24026_

(3) Date of filing (if you know): _8/19/2013_

(4) Nature of the proceeding: _Appeal_

(5) Grounds raised: _Cruel and unusual punishment, /ineffective_
_assistance of counsel, /ineffective assistance of appellate_
_counsel._

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☒ No

(7) Result: _Denied_

(8) Date of result (if you know): _7/25/14_

AO 241
(Rev. 01/15)

Page 5

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court:  Third DistrictappeLLate CourT

(2) Docket or case number (if you know):  C077577

(3) Date of filing (if you know):  10/20/2014

(4) Nature of the proceeding:  AppeaL

(5) Grounds raised:  CrueL and unusual punishment, /ineffective
assistance of counseL, /ineffective assistance of appeLLate
counseL

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes  ☒ No

(7) Result:  Denied

(8) Date of result (if you know):  10/23/2014

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:  Supreme courT of CaLifornia

(2) Docket or case number (if you know):  S225028

(3) Date of filing (if you know):  5/12/2015

(4) Nature of the proceeding:  AppeaL

(5) Grounds raised:  crueL and unusuaL punishmenT, /ineffective
assistance of counseL, /ineffective assistance of appeLLate
counseL

AO 241
(Rev. 06/13)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes     ☒ No

(7) Result:   Denied

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:      ☒ Yes     ☐ No

(2) Second petition:    ☒ Yes     ☐ No

(3) Third petition:      ☒ Yes     ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

GROUND ONE:   Prosecutorial Misconduct

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

a prosecutor who uses deceptive or reprehensible methods To persuade The Jury, commits misconduct. See page's 567-68) See page's 546-47, 552-557) See page's 544-45, 548.  See exhibit B

(b) If you did not exhaust your state remedies on Ground One, explain why:

AO 241
(Rev. 06/13)

Page 7

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☒ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes   ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                  ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?             ☐ Yes   ☒ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☒ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

I personally did not understand Law enough To Know what To do. I also did not Trust my appellate aTTorney, So I never read what he did on my appeal until now. God! what a big mistake That was, He did more For me in The "peTition For review" Than my public defender did Through my whole Court Case

AO 241
(Rev. 06/13)

Page 8

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One:

**GROUND TWO:**   ineffecTive assisTance of CounseL

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

my aTTorneys FaiLure To invesTigaTe my medicaL history, my MedicaL record shows
ThaT I have had Seizures since 2007, aLso medicaL records ThaT show I had a Serious
brain injury ThaT caused Seizures and serious memory Loss, evidence To This in exhibit A
aLso The habeas Corpus See page's 21-22. My aTTorneys FaiLure To ask The CourT To insTruct
on The defense of unconsciousness and accident / misForTune, aLso his FaiLure
To objecT To The prosecuTors mosT egregious acTs of misconducT is ineffecTive assisTance
See AOB 34, 38, 44-46, See page's 485-490, 904 of The MuLTi DiscipLinary accidenT
invesTigaTion Team, TranscripT

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)   **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?      ☒  Yes      ☐   No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes      ☐   No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:      Habeas Corpus

Name and location of the court where the motion or petition was filed:      Colusa Superior CourT

532 OAK sT        CoLusa, CaLif 95932

Docket or case number (if you know):        CV24026

Date of the court's decision:        7/25/2014

AO 241
(Rev. 06/13)

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?                         ☐ Yes      ☒ No

(4) Did you appeal from the denial of your motion or petition?                    ☒ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☒ Yes      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _Supreme Court of California_

_350 McALListEr sTreet_                          _SanFrancisco, CaLif 94102-4787_

Docket or case number (if you know): ___S225028___

Date of the court's decision: ___6/10/2015___

Result (attach a copy of the court's opinion or order, if available):   _Denied_ _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _____

_____

_____

**GROUND THREE:**      _ineffecTive assisTance of appeLLate counseL_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_CounseLs FaiLure To presenT grounds on direcT appeaL oF evidence of_

_acTuaL innocence aT peTiTioners criminaL TriaL_

_____

_____

_____

_____

_____

AO 241
(Rev. 06/13)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐ Yes    ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:  *it was my appellate attorney*

*who Filed The direct appeal*_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    *Habeas Corpus*_____

Name and location of the court where the motion or petition was filed:    *Colusa Superior Court*

*532 Oak St*_____    *Colusa, Calif 95932*

Docket or case number (if you know):    *CV24026*_____

Date of the court's decision:    *7/25/2014*_____

Result (attach a copy of the court's opinion or order, if available):    *denied*_____

_____

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☒ No

(4) Did you appeal from the denial of your motion or petition?    ☒ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☒ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:    *Supreme Court of California*

*350 McAllister Street*_____    *San Francisco, Calif 94102-4797*

Docket or case number (if you know):    *S 225028*_____

Date of the court's decision:    *6/10/2015*_____

Result (attach a copy of the court's opinion or order, if available):    *Denied*_____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three:   _____

_____

_____

**GROUND FOUR:**   _CrueL and unusuaL punishmenT_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_because of The Criminal Conviction For Gross negigence and aLLegation of_
_personal inFLiction of Great bodiLy injury as a resulT of peTitioner's diabetic_
_sickness is CrueL and unusuaL punishment_

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why:   _____

_____

_____

_____

(c)     **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?       ☐   Yes      ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:   _This was noT on The direcT_
_appeaL_

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes      ☐   No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   _Habeas Corpus_

AO 241
(Rev. 06/13)

Page 12

Name and location of the court where the motion or petition was filed: _Superior Court of California_

_532 OAK ST_ _Colusa, Calif 95932_

Docket or case number (if you know): _CV24026_

Date of the court's decision: _7/25/2014_

Result (attach a copy of the court's opinion or order, if available): _Denied_

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☒ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☒ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☒ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

AO 241
(Rev. 06/13)

Page 13

13.    Please answer these additional questions about the petition you are filing:

    (a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court
        having jurisdiction?    ☒ Yes    ☐ No

        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not
        presenting them:

    (b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so, which
        ground or grounds have not been presented, and state your reasons for not presenting them:

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction
    that you challenge in this petition?    ☐ Yes    ☒ No

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues
    raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy
    of any court opinion or order, if available.

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for
    the judgment you are challenging?    ☐ Yes    ☒ No

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues
    raised.

AO 241
(Rev. 06/13)

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _ALBERT SMITH_ _Post office Box 1346 Colusa, Calif 95932_

(b) At arraignment and plea: _Same as above._

(c) At trial: _Same as above_

(d) At sentencing: _Same as above_

(e) On appeal: _Han n. Tran_ _P.O. Box 10537 OAKland, Calif 94610_

(f) In any post-conviction proceeding: _an inmate name Gary in old Folsom state prison_ _P.O. Box 715071_ _Represa, Calif 95671_

(g) On appeal from any ruling against you in a post-conviction proceeding:

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? ☐ Yes ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? ☐ Yes ☒ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

_n/A_

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

   (1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in
          custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

          (A)    the date on which the judgment became final by the conclusion of direct review or the expiration
                 of the time for seeking such review;

          (B)    the date on which the impediment to filing an application created by State action in violation of
                 the Constitution or laws of the United States is removed, if the applicant was prevented from
                 filing by such state action;

          (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court,
                 if the right has been newly recognized by the Supreme Court and made retroactively applicable to
                 cases on collateral review; or

          (D)    the date on which the factual predicate of the claim or claims presented could have been
                 discovered through the exercise of due diligence.

AO 241
(Rev. 06/13)

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:    *Wrongful Conviction*

or any other relief to which petitioner may be entitled.

*Quinton Watts*

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on    *3/9/2016*    (month, date, year).

Executed (signed) on    *3/9/2016*    (date).

*Quinton Watts*

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

# PROOF OF SERVICE BY MAIL;

## [C.C.P. §§ 1013, 2015.5; U.S.C. 28 §§ 1746]

STATE OF CALIFORNIA)

KERN COUNTY          )

I, ("A") _Quinton Joey Watts_____ am a resident of the North Kern State Prison in Delano, Kern County, California, and I am at least 18 years of age. My mailing address is:

P.O BOX _5000____, Delano, California 93216- _5000_

On ("B") _3/9/2016_____ I served a true and correct copy of the following document(s):

("C") _Petition under 28 u.s.c.§2254 Writ of habeas Corpus; exHibit B; exHibit A; A open brief, Filed in The Third district Court by appellant attorney Han n. Tran_____

to each party listed below by placing them in an envelope with adequate postage attached or provided for and by depositing said envelope in a box for UNITED STATES MAIL at the N.K.S.P., Delano address.

This copy is being mailed to: _Clerk of The u.s. District Court For The Eastern District of California 501 I Street, Room 4-200 Sacramento, CaLif 95814_

I have mailed additional copies to:

I declare under penalty of perjury that the foregoing is true and correct.

Dated this day of: _3/9/2016_____ at North Kern State Prison

Signed: _____ CDCR I.D. # _6107896_

# EXHIBIT A

# INPATIENT/OUTPATIENT REGISTRATION RECORD

| ACCT NUM: | ADMIT DATE/TIME: | DIS DATE/TIME: | MRN: |
|---|---|---|---|
| 104876982 | 01/15/2007 22:07 | 01/16/2007 05:05 | 348645 |

## PATIENT INFORMATION:

**NAME:** WATTS, QUINTON J
**ADDRESS:** 1625 ROSEMARIE LANE 64
**CITY:** STOCKTON
**STATE/ZIP:** CA 95207
**PHONE:** (209)957-6796
**S.S.#:** 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

**BIRTHDATE:** 02/05/1956
**AGE:** 51
**GENDER:** MALE
**MARITAL STATUS:** MARRIED
**RELIGION:** NON
**ALIAS:**

## ACCOUNT INFORMATION:

**PAT CLASS:** E
**HOSP SERV:** DEP
**KAISER MED REC/INS ID:** 93422904C76153
**FINANCIAL CLASS:** 2110-MEDI-CAL/HEALTH PLN SJ-MCL HMO

**ADMIT CLERK:** MRCMCGES
**ADMIT DX:** ALTERED MENTAL STATUS
          ALTERED MENTAL STATUS

## PHYSICIAN INFORMATION:

**ADMITTING:** EHSAN SHIRAZI
**PRIMARY:**

**ATTENDING:** EHSAN SHIRAZI

## NEXT OF KIN:

**NAME:** WATTS, COLENE AYEESHA
**RELATION:** WIFE
**HOME PHONE:** (209)957-6796
**BUSINESS PHONE:**

## EMERGENCY CONTACT:

**NAME:** WATTS, COLENE AYEESHA
**RELATION:** WIFE
**HOME PHONE:** (209)957-6796
**BUSINESS PHONE:**

## GUARANTOR INFORMATION:

**NAME:** WATTS, QUINTON J
**ADDRESS:** 1625 ROSEMARIE LANE 64
**CITY:** STOCKTON
**STATE/ZIP:** , CA
**PHONE:** (209)957-6796

**RELATIONSHIP:** SELF
**EMPLOYER NAME:** STUDENT
**JOB TITLE:** STUDENT

## INSURANCE:

| PRIMARY: | SECONDARY: | TERTIARY: |
|---|---|---|
| **INS PLAN:** MEDI-CAL/HEALTH PLN SJ-MCL HMO | | **INS PLAN: INS. PLAN:** |
| **ADDR:** PO BOX 30490 | **ADDR:** | **ADDR:** |
| **CITY:** STOCKTON | **CITY:** | **CITY:** |
| **STATE/ZIP:** CA 95213 | **STATE/ZIP:** | **STATE/ZIP:** |
| **POL#:** 93422904C76153 | **POL#:** | **POL#:** |
| **GRP#:** | **GRP#:** | **GRP#:** |
| **SUBS:** WATTS QUINTON J | **SUBS:** | **SUBS:** |
| **REL TO PT:** A | **REL TO PT:** | **REL TO PT:** |

## COMMENTS:

**ADVANCE DIRECTIVE:**

DAMERON HOSPITAL ASSOCIATION

**IMPORTANT:** The examination and treatment that you have received in the Emergency Department has been given on an emergency basis only and is not intended as a substitute for complete medical service. It is important that you be checked again as instructed. If you notice any worsening of your symptoms, promptly call your referral doctor or return to the hospital. If an Xray or EKG has been performed, it has been read on a preliminary basis only, and will be reviewed by a radiologist or internist within 24 hours. You will be notified if additional findings are noted.

**YOUR DIAGNOSIS IS:** _Altered Mental Status Resolved / Possible post-ictal_

| TRAUMA | | ADULT | | PEDS | |
|---|---|---|---|---|---|
| Laceration/Puncture | Head Injury | Viral URI | Pneumonia/Bronchitis | Fever Control | Otitis Media |
| Sprain/Strain | Concussion* | Gastroenteritis | Asthma | Viral URI | Pneumonia/Bronchitis |
| Burn/Abrasion | Neck/Back Pain | Ulcer/Gastritis | COPD flare* | Gastroenteritis | Asthma* |
| Contusion | Corneal Abrasion* | Esophagitis* | Tension Headache | Pharyngitis, viral* | Poisoning, peds* |
| Fracture | Abscess* | Chest Wall Pain* | Hypertension, new | Pharyngitis, strep* | Febrile seizure* |
| Cast & Splint Care | Cellulitis* | Seizure, recurrent* | Dehydration* | Pharyng, strep pend'g* | Croup* |
| Crutch Rental | Animal Bite* | Allergic Reaction* | Overdose* | Hives* | Conjunctivitis* |

**GYN - GU**

| | |
|---|---|
| Miscarriage, Spont. | PID |
| Miscarriage, Threat. | Ovarian Cyst |
| Irregular Vag Bleed | Curettage |
| Vaginitis* | Menstrual Pain* |
| | |
| Cystitis, fem | Kidney Stone* |
| Pyelonephritis | GC/Chlamydia* |

Occasionally, people have a serious reaction to medications, such as vomiting, rash, swelling, or trouble breathing. If this happens, stop the medication and seek medical care.

☐ YOU HAVE BEEN GIVEN A SEDATIVE, HYPNOTIC, OR NARCOTIC MEDICATION. DO NOT DRINK, DRIVE OR OPERATE MACHINERY WITHIN 24 HOURS.

☐ Recheck with _____ in _____ days, or call San Joaquin Medical Society @ 952-5299 for a physician referral.

**ADDITIONAL INSTRUCTIONS:** (1) You must follow up with your doctor & ask for an MRI. Tonight on your CT-Scan there was an area called "Sella" which was slightly large & needs a close follow up with an MRI. (2) If you develop fever/chills, nausea/vomiting or seizures

**YOUR EMERGENCY DEPT. PHYSICIAN HAS BEEN:** _return to ER_

Learning Barriers ☐ N/A ☐ Addressed _____
☐ Exit Writer Instructions Given ☐ Spanish Version

**I have received and understand the instructions outlined above.**

X _____  X _K. Steele RN_  _1/16/07_  _0505_
Patient or representative  Hospital Staff  Date  d/c Time

DAMERON HOSPITAL WORK/SCHOOL NOTIFICATION FORM

_____ was seen in the Emergency Department on _____
He/she should be able to return to work/school on _____ with the following restrictions:
X _____ ,MD

**EMERGENCY DEPARTMENT PRESCRIPTION**

| Drug Name | Mg. | Disp | Sig. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

☐ Spanish instructions
☐ Do not substitute

PHYSICIAN SIGNATURE: _____ PRINTED NAME: _E. Shivey_ MD

A. Levine, MD  V. Ansley, MD  E. Amell, MD  P. Febres, MD  B. Reinke, MD  T. Thinh, MD
D. Shirley, MD  D. Lee, MD  G. Saffarian, MD  S. Ramakrishnan, MD  P. DaVisio, PA
M. Hudock, PA  A. Zeiter, MD  M. Osman, MD  M. Barkley, MD  J. Gladden, MD

**DAMERON HOSPITAL ASSOCIATION**

525 WEST ACACIA STREET
STOCKTON, CALIFORNIA 95203

7010-911 (1/20/05)

**WATTS, QUINTON J**
00104876982 DOB: 02/05/1956 M
MR:348645 01/15/2007 KMR:
DR. VALLEY EMERGENCY, PHYSICIANS

**EMERGENCY DEPARTMENT DISCHARGE INSTRUCTIONS**

☑ Nursing Assessment Reviewed ☑ Vitals Reviewed

V/S BP 115/76  HR 96  RR 16  Temp 37.4

## PHYSICAL EXAM

**General Appearance**
- ☑ no acute distress ___ mild / moderate / severe distress ___
- ☑ alert ___ lethargic / obtunded ___
  ___ apneic ___

**HEENT**
- ☑ no apparent trauma ___ scleral icterus / pale conjunctivae ___
- ☑ ENT inspection nml ___ deprsd gag reflex /poor handling of secretions ___
- ☑ pharynx nml ___ pharyngeal erythema / exudate ___
- ☑ airway intact ___ TM erythema / dullness / blood ___
  ___ tenderness / swelling / ecchymosis ___

**NEURO / PSYCH**
**higher functions**
- ☑ alert ___ abnormal response to commands ___
  no response  eyes open  slow  inappropriate
- ☑ oriented x3 ___ abnormal response to pain ___
- ☑ mood / affect nml  withdraws  flexor  extensor  none

  ___ aphasic  expressive / receptive ___
  ___ disoriented to  time / place / person ___

**cranial nerves-**
- ☑ normal as tested ___ facial palsy ( R / L ) ___
- ☑ PERRL  forehead:  involved  spared ___
  ___ tongue deviation ( to R / L ) ___
  ___ EOM palsy ___
- ☑ EOM's intact ___ unequal pupils ___
  R pupil ___ mm  L pupil ___ mm
  ___ abnormal funduscopic / papilledema ___

**cerebellar-**
- ☑ normal as tested ___ abnormal Romberg / gait / finger-nose test ___
**peripheral exam-**
- ☑ no motor deficit ___ weakness / hemiparesis / hemiplegia / dyspraxia ___
- ☑ no sensory deficit
- ☑ reflexes nml ___ pronator drift ( RUE / LUE ) ___
  ___ altered light-touch / pin-prick / 2-pt discrimin.

  ___ Babinski reflex ( R / L ) ___

  ___ asterixis ___

Reflexes

**NECK**
- ☑ supple ___ cerv. lymphadenopathy ___
- ☑ non-tender ___ stiff neck / meningismus ___
  ___ carotid bruit ___

**RESPIRATORY**
- ☑ no resp. distress ___ resp. distress ___
- ☑ breath sounds nml ___ wheezing ___
  ___ rales / rhonchi ___

**CVS**
- ☑ reg. rate, rhythm ___ tachycardia / bradycardia / irreg. irreg. rhythm ___
- ☑ heart sounds nml ___ JVD present ___
  ___ murmur  grade ___ /6  sys / dias ___
  ___ gallop ( S3 / S4 ) ___
  ___ decreased pulse(s) ___

**ABDOMEN**
- ☑ non-tender ___ guarding / tenderness ___
- ☑ no organomegaly ___ hepatomegaly / splenomegaly / mass ___
**SKIN**
- ☑ color nml, no rash ___ cyanosis / diaphoresis / pallor ___
- ☑ warm, dry ___ skin rash ___

**EXTREMITIES**
- ☑ non tender ___ tenderness ___
- ☑ normal ROM ___ pedal edema ___
- ☑ no pedal edema

Altered Mental Status 15   Rev. 05 / 05

---

## LABS, EKG & XRAYS

| CBC | Chemistries | ABGs | UA |
|---|---|---|---|
| ⊙ normal except | ⊙ normal except | time:___ | normal except |
| WBC 7 | Na 132 | __ LO2 __ RA | WBC ___ |
| Hgb 13.2 | K 4.1 | pH ___ | RBC's ___ |
| Hct 38.7 | Cl 99 | pCO2 ___ | bacteria ___ |
| Platelets 270 | CO2 25 | pO2 ___ | dip: ___ |
| segs 70 | Gluc 247 | **PULSE OX** | |
| bands ___ | BUN 8 | time: ___ | EtOH <5 |
| lymphs 16 | Creat 0.9 | ___ % sat | |
| | Ca 8.5 | Interp: ___ | ⊕ Cannabinoid |

Cardiac Monitor  NSR  no ectopy
other ___ at 905

EKG ___ NML  ☑ Interp. by me  ☑ Reviewed by me  Rate 96
☑ NSR  ☑ nml intervals  ☑ nml axis  ☑ nml QRS  ☑ nml ST/T

not / changed from: ___

CXR  ☐ Interp. by me  ☐ Reviewed by me  ☐ Discsd w/ radiologist
___ nml/NAD ___ no infiltrates ___ nml heart size ___ nml mediastinum

not / changed from: ___

Head CT  nml  ? genurous sella

**Treatment**  IV D50 ___ IV Narcan ___ Thiamine IV / IM ___ O2Sat ___

Intubated ___ by ED Physician  pre-oxygenated ___
versed / valium / ativan  pavulon  succinyl choline  vecuronium
#___ nasal / oral  breath snds equal  position confmd on CXR

## PROGRESS:

Time 03:45 ___ unchanged  improved  re-examined
prolonged IV drug therapy ___ minutes with ___
Pt A+O x4, back to his baseline

Discussed with Dr. ___ Time ___
will see patient in:  office / ED / hospital

___ Phone consult  brief  intermediate  CRIT CARE-  30-74 min
  complex  with ___  75-104 min ___ min
___ Rx given ___ Admit orders written  ___ Additional history from:
___ Prior records ordered  family caretaker paramedic

## CLINICAL IMPRESSION:

Confusion  Stupor  Coma  Intracerebral / Subarachnoid Bleed
Chronic Dementia  Subdural / Epidural Hematoma
Hypoglycemia / Insulin Reaction  Seizures / Post-ictal state
Hypernatremia / Hyponatremia  CVA (Stroke) / T. I. A.
Volume Depletion  Sepsis / Meningitis / Encephalitis
Overdose / Substance Abuse  Urinary Tract Infection / Pneumonia
Alcohol Intoxication  Hepatic Encephalopathy
Altered Mental Status Resolved
Possible Seizure

DISPOSITION-  ☑ home  ☐ admitted  ☐ transferred ___
Time ___
CONDITION-  ☐ unchanged  ☑ improved  ☑ stable ___

_____ NP

_____ MD

☑ Template Complete  ☐ Dictated Addendum  ☐ Progress Sheet

(T)

WATTS, QUINTON J  0010487698
DOB: 02/05/1959  07/19/2007  M KMR-
DIR. VALLEY EMERGENCY PHYSICIANS
MR: 348645

MRN: 348645, ACCT: 104876982, Printed by nfarley - CONFIDENTIAL

© 1996 - 2004 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.



# EMERGENCY PHYSICIAN RECORD
## Altered Mental Status (5)

TIME SEEN: 23:45 ROOM: 1A _____ EMS Arrival

HISTORIAN: patient (spouse) paramedics _____
__ HX / __ EXAM LIMITED BY: _____
__ EMS directed by Physician _____

## HPI

**chief complaint:** decreased mental status / confusion
low blood sugar (diabetic) fever

**started:** X 4 hrs _____ gradual-onset
sudden-onset
intermittent
constant
gone now   better   continues in ED

**character of altered mental status:**
disoriented confused agitated trouble concentrating
unresponsive decreased responsiveness seizure activity
_____
_____
_____

**context:**
nursing home resident / chronic dementia
found unresponsive / unknown duration _____
  by nursing home staff   family: _____
dextrostick low PTA ( _____ )   given D50 / Narcan PTA
   good / marginal / no   response
recent / heavy alcohol intake   ( beer / wine / liquor )
   last drink: _____
drug abuse / overdose _____

Usually-   alert, oriented x3        alert but confused
   alert but disoriented to time   poor alertness

**associated neuro symptoms:**
new weakness .
 • RUE  RLE  LUE  LLE   R / L  facial   general (diffuse)
altered sensation _____
 • RUE  RLE  LUE  LLE   R / L  facial
falling / decreased ability to stand / walk
 • weak  difficult  off balance   cannot walk   cannot stand
involuntary movements / seizure activity _____

Usually-  walks w/o assistance        uses wheelchair
   uses a cane / walker      stands for transfers
   walks only w/ assistance   bed-ridden
   unable to walk           unable to sit up

Similar symptoms previously in Sept of 2006
+ 7 SE at the time.

Recently seen / treated by doctor _____

## ROS

**CONST**
fever _____

**NEURO**
headache _____
head injury _____
dizziness _____

**PULMONARY**
chest pain _____
palpitations _____
cough _____
  sputum _____
trouble breathing _____

**ENDOCRINE** (if diabetic)
change in diet / activity / insulin

**EYES / ENT**
trouble w/ vision _____
sore throat _____
trouble swallowing _____

**GI / GU**
nausea _____
vomiting _____
abdominal pain _____
diarrhea _____
black / bloody stools _____
trouble urinating _____

**SKIN / LYMPH / MS**
skin rash / swelling _____
joint pain _____
back / neck pain _____

☑ all systems neg. except as marked

_____
_____

**PAST HX**   negative
diabetes  insulin / oral / diet _____
seizure disorder _____
stroke / TIA _____
hepatitis / cirrhosis _____
other problems 7 S2 hx in the past

angina / MI / CHF _____
AIDS / HIV _____
asthma / COPD _____
high blood pressure _____
GI bleeding _____
high cholesterol _____

**Surgeries:**
CABG _____
pacemaker _____
_____
_____
_____

cholecystectomy _____
appendectomy _____
hysterectomy _____
tonsillectomy _____

**Medications** none (see nurses note)
ASA  ibuprofen  acetaminophen
insulin

**Allergies** NKDA
see nurses note

**SOCIAL HX** smoker 1 PPD (drug abuse) MJ
history of alcoholism   nursing home resident _____
   2 Cans Beers / day

**FAMILY HX** stroke  migraines  CAD  HTN _____

x _____   Nurse / _____ MD
HISTORY- Nurse sign after recording ROS, PFSH, Physician initial after
reviewing with patient and confirming or revising all elements

WATTS, QUINTON J
00104876982 DOB: 02/05/1956 M
MR:348645 01/15/2007 KMR:
DR. VALLEY EMERGENCY, PHYSICIANS

©2001-2003 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

**14**

# EMERGENCY NURSING RECORD
## Neurological Complaints

**TRIAGE DATE** 15 Jan 07 **TIME** 2230 Immediate (2A) 2B

NAME: Watts, Quinton
AGE: 50 (M) / F
HISTORIAN: X patient __paramedics __family girlfriend
ARRIVAL MODE: X car __EMS __police____
PCP: __none Mital
IMMUNIZATIONS: current / not current / referral____
LAST TETANUS:____

**CHIEF COMPLAINT**
started ____ hrs / days ago
Started ↑ sleeping uncharacteristic of pt, forgetful, inapprop answers

__headache _____ X mental status change
__photophobia _____ X fatigue / weakness ____
__dizziness _____ __vision change ____
__syncope _____ __neck discomfort ____
__nausea / vomiting x ____ __seizure activity
__chemical exposure

**PAIN LEVEL** current ⦰ /10

**ALLERGIES** X NKDA / PCN / ASA / sulfa / latex

**MEDS** __none __see med list
humalog -
Numilin-
BP meds

**PAST HX** __negative
__CVA / TIA / heart disease / (HTN) / (diabetes: insulin)
__past surgeries none
X smoker / drugs / alcohol - Drinks beer 2 cans
Has smoked marijuana in past
__has been physically hurt or threatened by someone close denies

LNMP ____ G ____ P ____ Ab ____ pregnant / postmenopausal

**TRIAGE REASSESSMENT**

| TIME | BP | TEMP | PULSE | RESP | O2% | PAIN | CATEGORY | |
|------|------|------|-------|------|-----|------|-----|-----|
| 2230 | 112/74 | 37.4 | 96 | 16 | 100 | ⦰ | 1 | (2A) 2B |
| | | | | | | | 1 | 2A 2B |
| | | | | | | | 1 | 2A 2B |
| | | | | | | | 1 | 2A 2B |

Triage Signature [signature]

NURSING NOTES

NH-14 (8/28/03) **Neurological Complaints**
ED Nursing T-Sheet – Page 1/2

**VITALS**
BP ___/___ P____ RR____ temp____
O, Sat%____ GCS____
BP ___/___ P____ RR____ temp____
O, Sat%____ GCS____
BP ___/___ P____ RR____ temp____
O, Sat%____ GCS____

**TREATMENT PTA** __see EMS report __c-collar __backboard

**INITIAL ASSESSMENT** TIME:____ ROOM:____
**GENERAL APPEARANCE**
X no acute distress __mild / moderate / severe distress____
__alert __anxious / decreased LOC
X neat, clean __unkempt____
__tearful / crying

**FUNCTIONAL / NUTRITIONAL ASSESSMENT**
X appears well nourished __obese / malnourished____
X independent ADL __assisted / total care____

**RESPIRATORY**
X no resp distress __mild / moderate / severe distress____
X nml breath sounds __wheezing / crackles / stridor.____
__decreased breath sounds____
__tachypnea____

**CVS**
X regular rate __tachycardia / bradycardia / irrg. rhythm____
X pulses strong __pulse deficit____

**NEURO**
__oriented x 3 __disoriented to person / place / time
__moves all extremities X confused
__nml gait __weakness / sensory loss____
__PERRL __gait (unsteady) / shuffling____
__dystonia / tremors____
__pupils unequal____
__pinpoint / dilated____

**PSYCH**
__affect appropriate __depressed / flat affect
X cooperative __uncooperative / non communicative
__maintains eye contact __lack of eye contact
__nml speech __inappropriate speech / behavior
X responds appropriately __speech soft / slurred / mute / loud
__suicidal / homicidal ideation
__delusional / flight of ideas
__hallucinating visual / auditory

**SKIN**
X warm, dry __cyanosis / pallor
X intact __cool / diaphoresis
__open wound / needle tracks / lesion(s)
__skin rash

**ADDITIONAL FINDINGS**
denies pain
FSBS 245

Nurse Signature [signature]
WATTS, QUINTON J
00104876982 DOB: 02/05/1956 M
MR:348645 KMR:
DR. VALLEY EMERGENCY, PHYSICIANS

CONFIDENTIAL

WATTS, QUINTON J 00104876982 DOB: 02/05/1956 M KMR:
DR. VALLEY EMERGENCY, PHYSICIANS
MR:348645

# RADIOLOGY

CC: SHIRAZI, EHSAN MD
       aloc

**Procedure:  CT OF THE BRAIN #9**

Multiple axial computed tomography examination of the brain without
contrast enhancement performed.

Normal-sized ventricles with normal brain parenchyma seen without any
parenchymal mass or hemorrhage.  No evidence of epidural or subdural
hematoma being seen.  Questionable prominence of the sella turcica
seen, significance uncertain.  Bony calvarium is intact.

**CONCLUSION:**
Questionable prominent sella, otherwise unremarkable CT examination.
Suggest followup.

                    _____
                    Electronically Signed 01/16/2007 14:21:46
                    DAVID WONG, MD

D: 01/16/2007 09:13:30/T: 01/16/2007 10:27:59/DI: 158787/DN:

                              WATTS, QUINTON
                              348645
                              EMR



**DAMERON HOSPITAL**
**STOCKTON, CALIFORNIA 95203**

# RADIOLOGY

HTN,

# EMERGENCY CARE FLOW SHEET

| DATE | TIME IN | TIME OUT |
|---|---|---|
| | 1801 | 1845 |

| PATIENT NAME (LAST, FIRST) | CDC NUMBER | HOUSING | DOB |
|---|---|---|---|
| Watts, Quinton | F78495 | 520-19L | 2-5-56 |

| TIME OF INCIDENT | LOCATION OF INCIDENT | MODE OF ARRIVAL |
|---|---|---|
| Ø | Ø | Ambulance |

| STAFF NAME (LAST, FIRST) | OCCUPATION | SEX | AGE | DOB |
|---|---|---|---|---|
| Ø | Ø | M | 41 | 2/5/56 |

**CHIEF COMPLAINT:** Poss. Seizure

TB CODE

DATE OF LAST TETANUS

## MECHANISM OF INJURY
- ☐ STABBING
- ☐ PHYSICAL ALTERCATION
- ☐ GUNSHOT WOUND
- ☐ BURN
- ☐ SPORTS INJURY
- ☐ ON THE JOB INJURY
- ☑ OTHER ___

## SKIN COLOR
- ☑ NORMAL
- ☐ PALE
- ☐ ASHEN
- ☐ CYANOTIC
- ☐ FLUSHED

## SKIN TEMP
- ☐ HOT
- ☑ WARM
- ☐ COOL
- ☐ COLD

## SKIN MOISTURE
- ☑ NORMAL
- ☐ DRY
- ☐ MOIST
- ☐ PROFUSE

## CAPILLARY REFILL
- ☐ < 2 SECONDS
- ☐ > 2 SECONDS
- ☐ NONE

## GLASGOW COMA SCALE

| | | 
|---|---|
| EYE OPENING RESPONSE | SPONTANEOUS 4 4 4 4 / TO VOICE 3 3 3 3 / TO PAIN 2 2 2 2 / NONE 1 1 1 1 |
| BEST VERBAL RESPONSE | ORIENTED 5 5 5 5 / CONFUSED / INAPPROPRIATE / WORDS 3 3 3 3 / INCOMPREHENSIBLE SOUNDS 2 2 2 2 / NONE 1 1 1 1 |
| BEST MOTOR RESPONSE | OBEYS COMMAND 6 6 6 6 / LOCALIZES PN. 5 5 5 5 / WITHDRAWS PN. 4 4 4 4 / FLEXION PN. 3 3 3 3 / EXTENSION PN. 2 2 2 2 / NONE 1 1 1 1 |

## LUNG SOUNDS
| RT | LT |
|---|---|
| ☑ CLEAR | ☑ |
| ☐ WHEEZES | ☐ |
| ☐ RALES | ☐ |
| ☐ RHONCHI | ☐ |
| ☐ DIMINISHED | ☐ |
| ☐ ABSENT | ☐ |

## RESP. CHARACTER
- ☐ LABORED
- ☑ UNLABORED
- ☐ PAINFUL
- ☐ SHALLOW
- ☐ DEEP
- ☐ RETRACTION
- ☐ NASAL FLARING

## EVIDENCE OF TRAUMA
- ☐ CHEST  ☐ HEAD
- ☐ ABDOMEN  ☐ NECK
- ☐ G/U  ☐ EXTREMITIES
- ☐ PELVIS  ☑ OTHER
- ☐ BACK SPINE ___

| V I T A L S | TIME | TEMP | PULSE | RESP | BP | SaO2 | CURRENT MEDICATION |
|---|---|---|---|---|---|---|---|
| | 1800 | 98.7 | 86 | 18 | 147/92 | 97% | metformin 500 MAR |
| | | | | | | | amlodipine |

TIME 1800

| PUPIL RESPONSE | | | | |
|---|---|---|---|---|
| PUPIL SIZE | | | | |

KEY  C=CLOSED  B=BRISK  SL=SLUGGISH  F=FIXED

| I V | TIME | SOL | SITE | GAUGE | RATE | MEDICATION ALLERGIES |
|---|---|---|---|---|---|---|
| | Ø | | | | | |

| A D M M I N | TIME | ROUTE | RATE | SaO2 | MEDICATION GIVEN IN ER |
|---|---|---|---|---|---|
| | Ø | | | | Regular insulin 4 units SQ (R) abdomen |

## ABBREVIATION CODE
| | |
|---|---|
| Ab - Abrasion | E - Edema |
| Amp - Amputation | F - Closed Susp. Fracture |
| Av - Avulsion | H - Hematoma |
| B - Burn | L - Laceration |
| % - Percent | P - Petechiae |
| CP - Compound Frac. | R - Rash |
| E - Ecchymosis | S - Scar |
| ENT - Entrance Wound | Ex - Exit Wound |
| SI - Surgical Incision | |

**SUBJECTIVE: (PATIENT'S STATEMENTS, HISTORY)** "Blacked out"

**OBJECTIVE: (PHYSICAL EVALUATION)** A&O x3, V/s stable, FSB 267 @ 1800, Ø dizziness, Ø N/V, Ø resp distress, ambulated into Ø

**ASSESSMENT: (NURSING DIAGNOSIS)** ↑ TA. Knowledge deficit RT unknown outcome AEB disease process

**PLAN: (PT EDUCATION, FOLLOWUP, MD ORDERS, ETC.)** V/s neuro (✓), GCS 15, T/m Ø Jo.Mathos contacted; ordered s/scale Regular insulin 4units. Observe for 1 hour. Ambulated back to yard, Ø problems.

| PRINT NAME | SIGNATURE | | PATIENT DISPOSITION |
|---|---|---|---|
| R. Gonzalez | Rogg RN | RN/MT/AMD | ☐ RETURN TO CUSTODY |
| | | RN/MT/AMD | ☐ ADMIT TO INFIRMARY / HOSPITAL |
| | | RN/MT/AMD | ☐ TRANSPORT TO COMM. HOSPITAL VIA: |
| | | | ☐ AMBULANCE |
| | | | ☐ STATE VEHICLE |
| SUPERVISOR REVIEW | | | ☐ RELEASED TO CORONER |

**PATIENT CONDITION ON DISCHARGE**
- ☑ STABLE  ☐ UNSTABLE
- ☐ DECEASED  TIME ___

CDC 7403 (04/03)  EMERGENCY CARE FLOW SHEET

1 of 7

| DATE | TIME | PROB# | " Flu to TTA Visit 9/12/07 " |
|------|------|-------|------------------------------|
| 9-13-07 | 1130 | | S: (history includes details pertinent to the patient's medical complaint) |

Blood glucose: 200

A NKDA

M See MAR

P DMI, HTN

L Breakfast

E

P
A
I     Denies.
N

O: (physical assessment)  T: 98⁴  P: 68  R: 18  B/P: 133/81  Wt: 247

A+O×3  lungs: CTA  cardio: RRR, S₁S₂ ⊖ murmur.
Abd: ⊖ Tenderness ⊖ rigidity. (+) BS × 4 quads.
Amb: Steady gait  Skin: warm, dry, intact.

I/M States "he did not take BP Meds this
*m"

A: (medical/nsg diagnosis. MTAs may not independently analyze or interpret data.)
Anxiety R/T Unknown cause of Blacking out
9/12/07

P: (MTA – referral to a higher licensure for prioritization and evaluation.)
(RN -action to be taken by the RN so that the patient receives appropriate medical care.)

1. PCP Flu

E: (education provided)  1. PCP Flu  2. RTC PRN
C. Brunner RN

| INSTITUTION | ASP | ROOM / WING | 520-19L |
|-------------|-----|-------------|---------|

CDC NUMBER, NAME, (LAST, FIRST, MI)

**OUTPATIENT INTERDISCIPLINARY
PROGRESS NOTES**

Watts
F 78495

CDC 7254 (8/89)

STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

# MEDICAL HISTORY

Institution **RC \ DVI**

Name **WATTS, QUINTIN J.**  No. **F78495**  Date **10/14/2008**

Age **52**  Birthdate **2/5/1956**  Race **Black**  Birthplace **French Camp, CA**

Usual Occupation **Truck Driver**  Marital Status: S M **W** D  No. of Children **3**

Previous CDC No. **Forgoten.**

Describe any illnesses, injuries, conditions, or disabilities requiring medical attention.

Blindness: Yes (No)  OD Right Eye  OS Left Eye

Deafness: Yes (No)  Right Ear  Left Ear

Amputation: Yes (No)

Disability Impair: Yes (No)

What physical or mental illnesses, injuries, or conditions (including those in military service) have you had? Name condition, give year, name of hospital, and complications or resulting disability.   **I'm Denied.**

HIV Positive: Yes (No)  Hx of Psychiatric problems: Yes (No)

Hx of Liver Disease: Yes (No)  Hx Hep: A  B  C (circle)

Have you any:
Allergies: **NKDA**
Medical Sensitivities:
Present Medications:

D. Have you used:
Narcotics
Drugs
Alcohol to excess: Yes (No)
How long? Narc.......... Drugs............ Alc...........

Name of Drug or Narcotic:

State age and health of immediate family. If deceased, give age at time of death and cause.

Father: Healthy
Mother: Healthy
Brothers: 1  Healthy
Sisters: 4  Healthy
Wife or Husband:
Children: 3  Healthy

Surg
- (R) hand 1-2 mo
- Face 1-2 mo

SONo
(+) tablet DoIt
of TUDM

Med
asa
insulin
motrin
lantus
lisinopril
metformin
ALL NKDA

Physician's Comments: Involved in a bus accident from AAA...jo - received mult injury — has facial cuts & (L) leg - all are healed - denies any problems depression - having diff feeling asleep/staying asleep - Seen by psych on intake, has f/u Apt tomorrow - admit to depression - related to his accident 9 people died - denies SI/HI currently - just wants to be able to sleep

M Slope
Physician's Signature:

*INSTRUCTIONS: Fill out sections A thru E and encircle appropriate items in sections F thru V (back of page).*
*The physician will review the encircled items and make appropriate entries in space at bottom of each section.*
**SEE REVERSE SIDE**

196-A (2/02)   1of3

the claim." (**In re Robbins, supra,** 18 Cal.4th, at p. 780.) A petitioner knows or should know the factual or legal basis for a claim when he discovers the triggering facts supporting an investigation and understands the legal significance of those facts. (**See In re Gallego** (1998) 18 Cal.4th 825, 833; **In re Saunders** (1970) 2 Cal.3d 1033, 1040.) Thus, the timeliness of a petition is measured only from the time a petitioner knows, or reasonably should have known, both the triggering facts of his claim and the legal significance of those facts.

The California Supreme Court has defined "triggering facts" as those "facts sufficient to warrant further investigation, but insufficient to state a prima facie case for relief." (**In re Gallego, supra,** 18 Cal.4th, at p. 833.) If the Petitioner "reasonably lacked triggering facts supporting an investigation of [the instant] claim," a court cannot conclude that the Petitioner knows, or reasonably should have known of the information offered to support the claim. (Id., at p. 835.) Furthermore, even if a petitioner knows, or reasonably should have known, the triggering facts to support an investigation of his instant claim, a claim is not considered substantially delayed until the petitioner understands the legal significance of those facts. (**In re Saunders, supra,** 2 Cal.3d, at p. 1040.)

In Saunders, supra, that Petitioner claimed ineffective assistance of counsel at trial for failing to argue that the petitioner suffered from diminished capacity. (**Id.,** at pp. 1037-1038.) Although the Petitioner knew that he suffered from brain damage and that his counsel had medical records documenting his condition but failed to present them at trial long before filing his habeas claim, the California Supreme Court held that the petitioner's claims was not

substantially delayed because he was "unaware of the applicable law" until much later. (**Id.**, at p. 1040.) Because the Petitioner diligently investigated his claim after learning the legal significance of those two facts, the Court found that the claim was timely. (Id; see also In re Robbins, supra, 18 Cal.4th, at p. 781 **[holding that petitioner and counsel have a duty to investigate the factual and legal bases of potential claims only after learning about the triggering facts and their legal significance].)**

Unlike the petitioner in **In re Saunders, supra,** 2 Cal.3d 1033, Petitioner did not know the triggering facts giving rise to the instant claim. Petitioner's trial counsel never suggested to Petitioner that such mitigating facts might place him outside the scope of the charges. Indeed, his trial counsel's conducted absolutely no investigation into Petitioner's social background or his mental and physical health status. Given his trial counsel's failure to recognize the legal significance of the mitigating facts, which form the basis of the claim raised in the instant petition, Petitioner could not have reasonably known the legal basis for this petition.

Petitioner learned about the legal significance of his medical and mental disability only after he interviewed several family members, several witnesses, collected educational and legal records, examined a physical evaluation from his medical records, and researched various legal issues relevant to Petitioner's instant petition. Only after the completion of this investigation in January, 2014 did Petitioner understand the legal basis of his instant petition—that the mitigating facts of his background were relevant to his trial, and that failure to investigate and present it resulted in the trial

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 485 |

### Statement of Quintin Joey Watts (continued)

QW:   Bring it up.

GL:   As far as your ability to recall what happened right at the accident, totally understand
      that, do you, is it more of a function of the injuries you received in that accident?  Or
      something that happened before?  Was it…?

QW:   I think it was something that really happened during the accident…

GL:   From the head injury?

QW:   From the head injury.  Um, then again I really can't be a hundred percent sure.  I don't
      know, it's just, um…

GL:   You mentioned earlier that you were tired.

QW:   Tired.  That's what I think it was from, basically…

GL:   Fatigue?

QW:   Just being, yeah, hella tired.

GL:   Is there a possibility that you fell asleep?

QW:   That's a possibility.  That's, that's um, to me that's what I believe happened,  Because I
      mean, I had to be, to not know that the bus was swerving like that.  And, you know, I had
      to be hella tired man.

GL:   So, would, in terms of being tired and your medical condition would you, you would still
      rank the fatigue as, as being more of an influence on that?

QW:   More of an influence than, yeah, than medication, 'cause like I said…

GL:   Than your, than your insulin.

QW:   I watch myself, yeah.  I watch myself all the time, on my insulin, and I keep up with that.
      I think it had a lot more to do with just being hecka tired man.

GL:   Okay.  And your ability to recall events leading up to the crash was due to the injury to
      your head?

QW:   Yeah.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 486 |

### Statement of Quintin Joey Watts (continued)

GL:    Okay.

SH:    Okay.  Stop my recorder.  Appreciate you talking to us again, sorry it's [unintelligible].

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 487 |

## Statement of Quintin Joey Watts (continued)

*On Monday, December 15, 2008, at approximately 1130 hours, Investigator Hamann conducted a telephone interview with Quintin Watts. The purpose of the interview was to ask clarifying questions about Watts' prior medical history. Watts' medical records had been obtained after he signed a release of medical records/information. At no time during the conversation did Watts withdraw his consent of the release for the medical records/information. The following transcription of this interview was completed by Investigator Parsons. Extraneous words, such as "uh, um," and repeated words are not included, unless the words changed the meaning of the statement. The audio file of this interview will be retained by the CHP Williams Area.*

> SH: Investigator S. Hamann
> QW: Quintin Watts

*Investigator Hamann telephoned a number at DVI, and an unidentified employee answered the telephone.*

Unknown: Portis.

SH: Hey, it's Simon.

Unknown: Alright Simon, I'm going to put you on handset free and I'm gonna close the door.

SH: Okay, thanks.

Unknown: Okay, he's here.

*The employee brought Watts to the room to conduct the telephone interview.*

SH: Hey Quintin?

QW: Yes.

SH: Hey, it's Simon Hamann, we talked last week.

QW: Oh, yes.

SH: Hey I just wanted to call and say that, hey thanks for signing that paperwork. We got the medical records and stuff and I wanted to follow-up to see if you had any questions for me.

QW: Not really, well I did, was wondering when they were gonna, like, release my wallet or stuff or, you know, how long that was gonna be before they did that, release my money.

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 488 |

### Statement of Quintin Joev Watts (continued)

SH: Okay, I don't have that answer off the top of my head, but I will check into that right after I get off here, and so I think by the time you get ready to get out of there that should not be a problem.

QW: Okay, alright.

SH: And we got the records from Doctor Malak.

QW: Uh huh.

SH: I had a few questions on that if you don't mind.

QW: No.

SH: What can you tell me about the seizures you were suffering back in 2007?

QW: I had one, a seizure back in 2007, why I had it I really don't know. I know it, I lost a lot of memory behind it though, but that's about it.

SH: What, what, do you remember what the, your symptoms were when you were having the seizure?

QW: No, not at all. Like I said I lost a lot of memory.

SH: Okay. Was Colene with you when you had the seizure?

QW: I'm not, I think so.

SH: Do you remember what she said that happened to you while you were having the seizure?

QW: No.

SH: And so you went and saw Doctor Malak about that, right?

QW: Yeah.

SH: And what did he kinda prescribe for you to do?

QW: Nothing out of the, nothing out of the abnormal, I mean, I was just still on the same medication, nothing really different.

SH: Okay, and did they ever figure out why you were having the seizures?

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 489 |

## Statement of Quintin Joey Watts (continued)

QW: No, it was just one that I had. They never really told me or said anything to me about why it occurred, I guess maybe my blood sugar got too high or something, or, I'm not sure.

SH: Okay, looking at the records there it says that you came back in on, in March or something like that and that you were very upset because something hadn't, nothing had been done with the seizure. Why were you upset?

QW: I came back in and I was very upset?

SH: Uh huh.

QW: To the doctor's office?

SH: Yeah.

QW: Jesus, I don't know Mr. Simon I couldn't even...

SH: Okay.

QW: I couldn't tell you.

SH: And then do you remember like this last March you went back into the doctor's office?

QW: Last March...last March. I, I'm not sure why I, I usually go back to the doctor's office to get refills, or one time I went to get some kind of those, what do you call those pills for sexual thing, I don't know, but it wasn't nothing major I don't think.

SH: Okay. I think it was when you went in to get your medical record. I mean, not your medical record, but you get your medical card for your commercial license.

QW: Yeah, okay.

SH: Do you remember what you guys discussed then as far as the seizures were?

QW: No, I don't think so. I don't think, I don't remember Mr. Simon what we discussed, but they gave me my medical card, so obviously, I mean, it wasn't, whatever happened wasn't that serious.

SH: Okay. Do you remember telling him that the reason that you were having the seizures is 'cause you were drinking and taking drugs?

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 490 |

## Statement of Quintin Joey Watts (continued)

QW: No, I don't remember telling him that.

SH: Okay. And kinda going back to, before the crash on Saturday and Sunday.

QW: Uh huh.

SH: Do you remember what you were doing on the trip in the morning on Sunday, when, I think it's, what's her name, Elaina, was driving?

QW: Do I remember what I was doing?

SH: Yeah.

QW: When Elaina was driving, Saturday morning?

SH: Yeah.

QW: I don't think I was doing anything different than I usually do, sit there and watch, and, or maybe eat or something like that.

SH: Okay. So you weren't like laying down in the back trying to get some sleep while she was driving?

QW: That Sunday morning, I might have, I don't know.

SH: Okay. So you just don't really remember what was going on?

QW: Not, not really. I mean, you know, not to, not, no I don't think it was anything that really I did that, that...

SH: Okay. No, I know it's been a little while, so, alright. And any, anything else that you can think of, any questions I can answer for you? I'll take a look into that wallet when we're gonna release all that, and it should be, we should be done with that by the time you're getting ready to get out. Is it still the 12th or the 14th that you're supposed to be getting out?

QW: According to them it still the 12th, so, you know, I don't, they haven't changed it, but when the 12th comes and I'm ready to go out they might change it then.

SH: Okay. Okay, so any other questions for me?

QW: No, that's it.

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 904 |

**Conclusions** (continued)

Human Factors (continued)

✗ Watts also had a history of seizures. He was diagnosed with a seizure disorder on January 17, 2007, as noted in his medical chart, and again on March 20, 2007, as again noted on his medical chart. During the March 4, 2008, examination, his medical chart had noted that Watts had stated, "Was alcohol and drugs, that's why I was having seizures." Despite this history of seizures, when Watts completed Page 1 of the DL 51, Section 2 – Health History, he indicated "no" on the question of whether he had a history of seizures or epilepsy. P.A. Anslinger made no mention on the completed DL 51 of Watts' diagnosed history of a seizure disorder.

✗ The completed Medical Examination Report was forwarded to the California Department of Motor Vehicles (DMV). DMV accepted the medical certification and indicated on Watts' DMV record that Watts' medical certificate was valid through March 13, 2010. ✗

✗ A blood sample was drawn from Watts at approximately 2152 hours, on October 5, 2008, after he had been transported to Woodland Memorial Hospital. This blood sample was submitted to Valley Toxicology Services, Incorporated, for analysis. This analysis indicated no presence of alcohol, supporting the conclusion that Watts was not under the influence of alcohol at the time of the collision. However, the toxicology analysis was positive for the presence of benzodiazepines. Additional analysis indicated that there was a level of 183 ng/mL of Midazolam, a benzodiazepine, in the blood sample. Medical records released by Woodland Memorial Hospital indicated that Watts was administered Versed, which is a form of Midazolam. The Versed was administered prior to the blood sample being drawn and was administered as part of Watts' medical treatment. Based upon the known source of the benzodiazepine, it was concluded that Watts was not under the influence of drugs at the time of the collision.

✗ A significant factor in this collision was determined to be driver fatigue. Watts had worked approximately 19 to 20 hours on the day prior to the collision. On October 4, 2008, he began his work shift at Cobbs Coaches, in Sacramento, California, at approximately 0700 hours. He worked through the day, driving, and observing other drivers as part of his training. His work shift ended between approximately 0200 and 0300 hours, on October 5, 2008. He drove home to Stockton, California, and claims to have slept between 1 and 2 ½ hours between approximately 0330 and 0600 hours.

On the day of the collision, October 5, 2008, Watts awoke, drove back to Sacramento, and began his work shift at approximately 0700 hours. He cleaned and prepared a bus and rode as a passenger as part of his training on a trip to Thunder Valley Casino, in Lincoln, California. Watts attempted to rest in the bus during this trip. He arrived at the Thunder Valley Casino at approximately 0900 hours.

To The Honerable Judge That's reviewing This Case

I am Sending a open brief Filed by my appellate attorney on October 1, 2010 I Feel This opening brief will show how The district attorney and my public defender went around The Truth in order To get a conviction. There are a Few Factors I Feel you should know, one Thing is my inability To remember That I had Seizure's. iT Took me From 2009 all The way To 2013 To Learn what happen To me on That bus. one thing I knew is That I was not Sleep. I wrote my primary doctor, "doctor Malak" several Times Trying To get my medical records. as you can see, I still don't have Those Medical records. The medical records I have are From The hospital I went To during The accidents I went Through because of a IncidenT That happen To me in 2006, when I was jump by a Few guys and stomped in The head and body and LefT For dead. my ex-wife had To Tell me about That in 2013, when I was telling her about all The blackouts I was having in Folsom prison and going To San Joaquin hospital where I was born in stockton or French Camp. I have a judgement From a complaint I Filed against my doctor with The medical board of California. They Found him guilty of gross negligent. medically I should not have been approved To drive anything

Thank you

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA, ) NO. C063651

        Plaintiff and Respondent,

vs.

   (Colusa County No. CR50607)

QUINTIN JOEY WATTS,

        Defendant and Appellant.

ON APPEAL FROM THE JUDGMENT OF THE SUPERIOR COURT
COUNTY OF COLUSA, STATE OF CALIFORNIA
THE HONORABLE JEFFREY A. THOMPSON

### APPELLANT'S OPENING BRIEF



HAN N. TRAN
State Bar #184420
P.O. Box 10537
Oakland, CA 94610
(510) 290-6475

Attorney for Appellant
QUINTIN JOEY WATTS

Appointed by the Court of
Appeal under the Central
California Appellate Program
Independent-Case System

## TABLE OF CONTENTS

STATEMENT OF APPEALABILITY      1

STATEMENT OF THE CASE      1

STATEMENT OF FACTS

   I. The Prosecution's Case.      2

   II. The Defense Case.      9

ARGUMENT      11

I. THE TRIAL COURT ERRED WHEN IT FAILED TO
INSTRUCT *SUA SPONTE* THE JURY ON CALCRIM
NO. 3425 REGARDING THE DEFENSE OF
UNCONSCIOUSNESS, THEREBY DEPRIVING APPELANT
OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH
AMENDMENTS      12

   A. The Evidence And Defense Counsel's Opening
Statement And Closing Argument Regarding Accident And
Misfortune And Unconsciousness.      12

   B. Despite Evidence Supporting The Instruction And Despite
Reliance By the Defense On The Defense of Unconsciousness,
The Court Failed To Instruct The Jury *Sua Sponte* On CALCRIM
No. 3425.      15

   C. The Trial Court's Failure To Instruct The Jury *Sua Sponte*
On The Defense Of Unconsciousness (CALCRIM No. 3425) Was
Prejudicial And Warrants A Reversal.      20

II. THE TRIAL COURT ERRED WHEN IT FAILED
*SUA SPONTE* TO INSTRUCT THE JURY ON CALCRIM
NO. 3404 REGARDING THE DEFENSE OF ACCIDENT
AND MISFORTUNATE, THEREBY DEPRIVING APPELANT
OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH
AMENDMENTS                                                                    22

A. Despite Evidence Supporting The Instruction And
Despite Reliance By the Defense On The Accident And Misfortune
Defense, The Court Failed To Instruct *Sua Sponte* The Jury On
CALCRIM No. 3404.                                                             22

B. The Trial Court's Failure To Instruct The Jury *Sua Sponte*
On The Defense Of Accident And Misfortune (CALCRIM
No. 3404) Was Prejudicial And Warrants A Reversal.                            24

III. DEFENSE COUNSEL WAS INEFFECTIVE UNDER
THE SIXTH AMENDMENT WHEN HE FAILED TO
REQUEST THE COURT INSTRUCT THE JURY ON THE
DEFENSES OF UNCONSCIOUSNESS (CALCRIM NO. 3425)
AND ACCIDENT AND MISFORTUNE (CALCRIM NO. 3404)                                26

A. Defense Counsel's Failure To Request The Trial Court
Instruct The Jury On The Defenses Of Unconsciousness (CALCRIM
NO. 3425) And Accident And Misfortune (CALCRIM NO. 3404)
Was Not Objectively Reasonable And Was Not An Informed Or
Tactical Decision.                                                           27

B. But For Defense Counsel's Failure, There Is A Reasonable
Probability The Jury Would Not Have Convicted Appellant Of
Vehicular Manslaughter.                                                       28

IV. THE PROSECUTORS COMMITTED MISCONDUCT
DURING THEIR CLOSING ARGUMENTS, THEREBY
DEPRIVING APPELLANT OF HIS DUE PROCESS RIGHTS
UNDER THE FOURTEENTH AMENDMENT, AND
DEFENSE COUNSEL'S FAILURE TO OBJECT AND TO
REQUEST TO STRIKE THE COMMENTS WAS
INEFFECTIVE IN VIOLATION OF THE SIXTH AMENDMENT                               32

A. Voir Dire Argument And Closing Arguments By The
Prosecutors.                                                                  32

B. Defense Counsel Was Ineffective When He Failed To
Object And To Request The Court To Strike The Improper
And Inflammatory Comments Made By The Two Prosecutors
During Closing Arguments.                                        34

C. But For Defense Counsel's Ineffective Performance In
Failing To Object To, And To Make A Motion To Strike, The
Acts Of Misconduct By The Two Prosecutors, There Is A
Reasonable Probability The Jury Would Not Have Convicted
Appellant Of The Vehicular Manslaughter Charges.                41

V.  THE CUMULATIVE EFFECTS OF THE
PROSECUTORIAL MISCONDUCT AND THE ERRORS AT
TRIAL VIOLATED APPELLANT'S RIGHT TO DUE
PROCESS, RIGHT TO COUNSEL, RIGHT TO JURY TRIAL
AND RIGHT TO ADEQUATE INSTRUCTIONS UNDER
THE SIXTH AND FOURTEENTH AMENDMENTS                             48

CONCLUSION                                                      51

CERTIFICATE OF WORD COUNT                                       52

# TABLE OF AUTHORITIES

## Cases

*Bradley v. Duncan*
  (9th Cir. 2002) 315 F.3d 1091,
  *cert. denied* 540 U.S. 963 (2003)                    20, 24

*Brecht v. Abrahamson*
  (1993) 507 U.S. 619                                         49

*Chambers v. Mississippi*
  (1973) 410 U.S. 284                                    48, 49

*Chapman v. California*
  (1967) 386 U.S. 18                                     42, 43

*Conde v. Henry*
  (9th Cir. 1999) 198 F.3d 734                           20, 24

*Darden v. Wainwright*
  (1986) 477 U.S. 168                                    35, 42

*Derden v. McNeel*
  (5th Cir. 1991) 938 F.2d 605                                48

*In re Greenfield*
  (1970) 11 Cal.App.3d 536                            34-35, 39

*In re Marquez*
  (1992) 1 Cal.4th 584                                       26

*Parle v. Runnels*
  (9th Cir. 2007) 505 F.3d 922                                49

*People v. Alvarez*
  (1996) 14 Cal.4th 155                                      35

*People v. Bolton*
  (1979) 23 Cal.3d 208                                       41

*People v. Breverman*
  (1998) 19 Cal.4th 142                          15, 17, 23, 26

iv

*People v. Castillo*
    (2008) 168 Cal.App.4th 364 ..... 42

*People v. Coffman*
    (2004) 34 Cal.4th 1 ..... 35

*People v. Cox*
    (1944) 67 Cal.App.2d 166 ..... 17

*People v. Dominguez*
    (2006) 39 Cal.4th 1141 ..... 15, 17, 23

*People v. Ervin*
    (2000) 22 Cal.4th 48 ..... 15

*People v. Fields*
    (1983) 35 Cal.3d 329 ..... 36, 37, 40

*People v. Freeman*
    (1943) 61 Cal.App.2d 110 ..... 16, 17, 29

*People v. Friend*
    (2009) 47 Cal.4th 1 ..... 35, 42

*People v. Gonzales*
    (1999) 74 Cal.App.4th 382 ..... 17, 22, 29

*People v. Haley*
    (2004) 34 Cal.4th 283 ..... 17

*People v. Halvorsen*
    (2007) 42 Cal.4th 379 ..... 16, 29

*People v. Hill*
    (1998) 17 Cal.4th 800 ..... 41, 46, 48

*People v. Jones*
    (1991) 234 Cal.App.3d 1303 ..... 23

*People v. Lara*
    (1996) 44 Cal.App.4th 102 ..... 22, 29

*People v. Ledesma*
   (1987) 43 Cal.3d 171                     26, 27

*People v. Leonard*
   (2007) 40 Cal.4th 1370              36, 37, 40

*People v. Lucas*
   (1995) 12 Cal.4th 415              27, 28, 40

*People v. Martinez*
   (2010) 47 Cal.4th 911             35, passim

*People v. May*
   (1989) 213 Cal.App.3d 118       20, 21, 24, 25

*People v. Mayberry*
   (1975) 15 Cal.3d 143                  20

*People v. Mendoza*
   (2007) 42 Cal.4th 686             36, 40, 44

*People v. Montoya*
   (1994) 7 Cal.4th 1027                  15

*People v. Newton*
   (1970) 8 Cal.App.3d 359              17, 19

*People v. Ochoa*
   (1998) 19 Cal.4th 353               16-17

*People v. Oropeza*
   (2007) 151 Cal.App.4th 73          15, 24

*People v. Pensinger*
   (1991) 52 Cal.3d 1210            36, passim

*People v. Pope*
   (1979) 23 Cal.3d 412             27, 28, 40

*People v. Price*
   (1991) 1 Cal.4th 324                 35

*People v. Riggs*
(2008) 44 Cal.4th 248                                    45

*People v. Rodriguez*
(1981) 109 Cal.App.3d 457                           48

*People v. Rogers*
(2006) 39 Cal.4th 826                             15-16, 17

*People v. Sanders*
(1995) 11 Cal.4th 475                                   36

*People v. Simington*
(1993) 19 Cal.App.4th 1374                          39, 44

*People v. Soriano*
(1987) 194 Cal.App.3d 1470                          34-35

*People v. Stansbury*
(1993) 4 Cal.4th 1017                            36, passim

*People v. Stritzinger*
(1983) 34 Cal.3d 505                                   42

*People v. Tewksbury*
(1976) 15 Cal.3d 953                                   17

*People v. Wallace*
(2008) 44 Cal.4th 1032                                 35

*People v. Wharton*
(1991) 53 Cal.3d 522                                   39

*People v. Williams*
(1997) 16 Cal.4th 153                                  39

*People v. Wilson*
(1967) 66 Cal.2d 749                                   19

*Stansbury v. California*
(1994) 511 U.S. 318                                    36

*Strickland v. Washington*
(1984) 466 U.S. 668          26, 27, 29, 35, 47

*Sullivan v. Louisiana*
(1993) 508 U.S. 275          20, 24

*Thomas v. Hubbard*
(9th Cir. 2002) 273 F.3d 1164          48,

*United States v. Escobar de Bright*
(9th Cir. 1984) 742 F.2d 1196          20, 24

*United States v. Gaudin*
(1995) 515 U.S. 506          20, 24

*United States v. Unruh*
(9th Cir. 1988) 855 F.2d 1363, 1372,
*cert. denied* 488 U.S. 974 (1988)          20, 24

## Statutes

Penal Code
     Section 26          16, 22, 29
     Section 192          1, 19, 20, 25
     Section 1237          1
     Section 2933.1          2
     Section 12022.7          1, 2

Vehicle Code
     Section 21650          9, 20

## **Other Authorities**

United States Constitution
    Sixth Amendment                             11, passim
    Fourteenth Amendment                 11, passim

California Constitution
    Art. I, section 15                          20, 24, 26

CALCRIM
    No. 592                                   21, 25
    No. 593                                   21, 25
    No. 3404                              22, passim
    No. 3425                              12, passim

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**THIRD APPELLATE DISTRICT**

PEOPLE OF THE STATE OF CALIFORNIA, }   NO. C063651

         Plaintiff and Respondent, }   (Colusa County No. CR50607)

   vs.

QUINTIN JOEY WATTS,

         Defendant and Appellant. }

## STATEMENT OF APPEALABILITY

This appeal is taken from a final judgment of conviction following trial by jury. The appeal is cognizable pursuant to Penal Code section 1237.[1]

## STATEMENT OF THE CASE

By a second amended information filed in Colusa Superior Court on October 5, 2009, appellant Quintin Joey Watts was charged with violation of eleven counts of felony vehicular manslaughter (§ 192, subd. (c)(1)), and as to each count, twenty-three separate allegations of the great bodily injury enhancement (§ 12022.7, subd. (a)). (1CT 93-103.) Following trial, the jury returned on October 8, 2009 with its verdicts of guilty on counts 1 through 11 and found true twenty-one of the special allegations of great bodily injury. (1CT 137; 2CT 298-308, 309-14, 316-19, 321-31.) It did not

---

[1] All further statutory references are to the Penal Code, except as otherwise specified.

1

find true allegations numbers 7 and 12. (1CT 137; 2CT 315, 320.)

At sentencing on November 4, 2009, the trial court sentenced appellant to an aggregated term of 26 years, 4 months in state prison. (3RT 621; 2CT 430.) On count 1, appellant was sentenced to the midterm of four years in state prison as well as three consecutive terms of three years each for three of the great bodily injury enhancements (9 years total on the enhancements) for a total of 13 years. (3RT 621; 2CT 417-18, 430.) Regarding count 1, the court stayed the remaining 18 great bodily injury enhancements. (3RT 621; 2CT 418, 430, 432.)

For each of the remaining counts 2 to 11, the court imposed consecutive, subordinate terms of 16 months, for a total of 13 years, 4 months. (3RT 621-22; 2CT 418, 430, 432.) Appellant's aggregate prison sentence term was 26 years, 4 months. (3RT 621-22; 2CT 418, 430, 432.) The court awarded appellant presentence custody credits of 139 days, based on 121 actual days of custody plus 18 days of credits under section 2933.1. (3RT 622; 2CT 419, 430.)

Appellant filed a timely notice of appeal on December 9, 2009. (2CT 434, 442.)

## STATEMENT OF FACTS

### I.   The Prosecution's Case.

On October 5, 2008, Colusa County Sheriff Deputy Merced Corona left work at the Sheriff's Office and started driving home at 6:00 p.m. (1RT 130-31.) As he was driving southbound on Lone Star Road, Corona noticed a bus approaching him as it traveled northbound on Lone Star Road. (1RT 131.) When it was approximately a quarter of a mile south of him, the bus started to swerve towards the center line. (1RT 132.)

The bus then crossed the center line, continuing to swerve towards

2

the west (the bus's left). (1RT 133.) It continued moving west, towards the shoulder of the opposite lane. (1RT 133.) At some point before it went off the road, the bus corrected itself and attempted to get back in its northbound lane. (1RT 133.) The bus moved towards the east, and then the passenger side of the bus went all the way off the road into the dirt portion of the shoulder. (1RT 133.)

At that point, the bus made a very sudden, violent turn back to the west. (1RT 133-34.) The bus swayed to one side, then the other. (1RT 136.) It continued west, across both lanes of traffic and finally went head first into the ditch that ran alongside the road. (1RT 133-34.) According to Corona, there was no visible indication of braking by the bus before it crashed into the ditch. (1RT 137.)

Lone Star Road is a two-lane roadway, with one lane for travel in the northbound direction and one lane for travel in the southbound direction. (1RT 147-48.) The two lanes are separated by a broken, yellow line. (1RT 147-48; 161.) There is an unpaved shoulder on each side of the roadway, and on the other side of each shoulder is a drainage ditch. (1RT 163-65.)

Around the area of the accident, the road was level and relatively straight. (1RT 149.) South of the accident scene, there are three curves on Lone Star Road between the accident scene and Hann Road, and a yellow warning sign was posted before each curve to warn drivers. (1RT 151.)

The California Highway Patrol multidisciplinary accident investigation team ("M.A.I.T.") was assigned to investigate and reconstruct this accident. (1RT 140, 142.) California Highway Patrol Officer Nate Parsons, a member of M.A.I.T., determined the path of the bus as well as its collision sequence. He confirmed much of Corona's observations regarding the movement of the bus on the roadway before it came off the

3

roadway west side of Lone Star Road. (See 1RT 239-40, 42.) There was no evidence of braking by the bus prior to its collision. (1RT 216, 291, 292-93.)

According to Parsons, the bus descended down into the drainage ditch, and the front of the bus struck the embankment. (1RT 221, 232.) The back of the bus pitched up, the bus rotated, and the rear of the bus then struck the side of the embankment of the ditch. (1RT 241, 243.) The bus then rebounded to and struck the other side of the embankment. (1RT 241.) Finally, the bus came to rest right side up. (1RT 241-42.) The bus suffered major damage. (1RT 227, 230-31.)

Appellant Quintin Joey Watts was the driver of the bus and was transporting 39 passengers as well as Daniel Cobb, the owner of the bus and appellant's employer. (1RT 198-200.) A number of passengers were thrown completely out of the bus during the collision. (1RT 244.) Appellant and Cobb were also thrown out of the bus through the front windshield. (1RT 259.) Other passengers were thrown around inside the bus during the collision sequence. (1RT 248-51.)

M.A.I.T. investigators interviewed appellant on two separate occasions. The first time was with Parsons and Officer Simmon on October 8, 2008, at the hospital where appellant had been admitted following the bus crash. (1RT 264.)

Appellant told them that he has had a commercial license for approximately 12 to 13 years. (1RT 268.) At the time of the accident, appellant had a valid Class A commercial driver's license. (1RT 261.)

Appellant had been working for Cobb for approximately one month before the collision. (1RT 269.) Cobb owned Cobb Transportation, which was a charter bus company that took passengers to and from local casinos.

4

(1RT 200, 269.) During the month he was employed, appellant was in training to learn the routes for the casino runs. (1RT 269-70.) During his training, appellant was paid $35 each day. (1RT 270.) Upon completion of his training, appellant was supposed to be paid $70 to $80 each day. (1RT 270.)

Upon questioning, appellant described his work day for Friday, October 3, 2008. (2RT 305.) Appellant left his home early that morning in Stockton in order to arrive at Cobb's bus yard in Sacramento at 7:30 a.m. to pick up passengers to drive to Thunder Valley Casino. (2RT 305.) Thereafter, he drove them back to Sacramento and dropped them off. (2RT 305.) Appellant was done working at about 1:30 p.m. or 2:00 p.m. (2RT 305.) Afterwards, appellant drove home to Stockton and went to sleep at 9:00 p.m. (2RT 305-06, 339.)

After about seven and a half hours of restless sleep, appellant woke up the next morning on Saturday at around 4:30 a.m. (2RT 340.) He arrived at work in Sacramento at 7:00 a.m. (2RT 307.)

Appellant went as a passenger on the bus run that morning to Thunder Valley Casino. (2RT 307-08, 340.) They returned to the bus yard in Sacramento around 2:00 p.m. or 2:30 p.m. (2RT 307-08.) At about 4:00 p.m., appellant left with Cobb to do the bus run to Colusa Casino. (2RT 308.)

Initially, Cobb drove the bus to the passenger pick-up locations. (2RT 308.) After the last pickup, appellant drove the rest of the way to Colusa Casino, with Cobb still on the bus. (2RT 308-09.) After they arrived at the casino, appellant walked around, ate a buffet dinner, and gambled a little. (2RT 309.) Cobb took a nap back at the bus. (2RT 309.)

Cobb drove the bus back to Sacramento, and appellant stayed awake

to observe Cobb. (2RT 310, 311, 337.) They finished dropping off the passengers and returned to the bus yard at around 1:00 to 3:00 a.m. (*Ibid.*) Appellant arrived home in Stockton at about 3:00 to 4:00 a.m. (2RT 311, 337.)

At around 5:00 or 6:00 a.m., appellant woke up to drive back to work. (2RT 311, 337.) Appellant was at work in Sacramento by 7:30 a.m. (2RT 311-13.) From Saturday, October 4th, at 4:00 a.m. to 4:30 a.m. when appellant woke up before going to Sacramento to work, appellant had slept about one to one and a half hours by the time he arrived at work at 7:30 a.m. on Sunday, October 5th. (2RT 313.)

After he arrived at work that morning, appellant went with his stepsister (who also worked with Cobb) as she drove the morning bus run to Thunder Valley Casino. (2RT 313-14.) Appellant told the investigators, "The whole time I was tired." (2RT 314.)[2] So, when they arrived at Thunder Valley Casino at around 9:00 a.m., appellant stayed on the bus to rest and slept for about one and a half to two hours. (2RT 314-15, 343-44.) He didn't get a chance to eat before they left the casino at 1:00 p.m. to return to Sacramento. (2RT 315.)

Again, appellant's stepsister drove. (2RT 345.) After they arrived back at the bus yard in Sacramento, appellant went to eat at Taco Bell. (2RT 316.) Appellant drank a mixed fruit drink with his food. (2RT 316.) Appellant returned to the bus yard and tried to sleep but was unable to. (2RT 316-17.) Still, appellant laid down and got some rest. (2RT 317.)

At 4:00 p.m. later that same day, appellant left with Cobb on the

---

[2] During one of his interviews, appellant told the investigators that when he drove as a commercial trucker in the past, he would sometimes pull over to rest when he felt fatigue. (2RT 325-26.)

afternoon bus run to Colusa Casino. (2RT 317, 346.) Before they left, appellant told Cobb that appellant was tired, and Cobb responded "that's okay" (2RT 337), "just . . . drive" (2RT 318, 337.) Appellant was "hecka tired" at this point. (2RT 338.) As he recounted to the investigators, appellant "even told [his] stepsisters, they knew I was hecka tired, but they wanted me to drive. And I didn't say – I didn't complain too much about it because I was like, I'm just – I just, you know, want a job. I wanted to, you know, get trained on this route because once I'm trained on this route I start making $700 a week. So I'm not really doing a whole lot of complaining about it. . . . I'm like, okay, you know, I need this job, this money, you know." (2RT 338-39.)

After the passengers were picked up in Sacramento, appellant drove the bus northbound on Interstate 5 to the Hann Road exit. (2RT 317-18.) After they exited the freeway, appellant continued driving the bus northbound on Lone Star Road. (2RT 318.)

Appellant told the investigators that after they were on Lone Star Road, appellant "blacked out" at some point. (2RT 319.) When appellant woke up, "Next thing I remember is freaking, the bus mangled and I'm out there asking people what the hell happened." (2RT 319-20.)

Before the bus crashed, Choua Seng Saechao, one of the passengers who sat in a front row seat, noticed that appellant was falling asleep as his eyes were going smaller and smaller. (2RT 399-400.) Another passenger, Cheng Fey Saeturn, looked at appellant through the big, rear view mirror above appellant's seat and saw that he looked like he was sleepy. (See 2RT 406, 407-08.) Another passenger, Khou Yang, also looked in this mirror and saw that appellant was sleeping right before the bus crashed. ( 2RT 415-16.)

7

Right before the crash, Saechao saw Cobb get up from his seat and approached appellant. (2RT 401.) Standing next to appellant, Cobb asked him, "What are you doing? (2RT 402.) Cobb repeated twice more, in a louder voice, "What are you doing?" (2RT 402.) At that point, the bus flipped over. (2RT 402.)

Appellant had diabetes and was insulin-dependent. (2RT 321.) His targeted blood sugar level was between 70 and 170. (2RT 348.) In general, if his blood sugar level rose to the 200 to 300 range, appellant would give himself an insulin injection. (2RT 322.) Appellant would become tired and drowsy if his blood sugar level was too high and he didn't give himself an injection. (2RT 323.) Appellant couldn't remember if he checked his blood sugar level before he left for work on Sunday morning on October 5th. (2RT 323.)

After the bus crash, ambulance personnel tested appellant's blood sugar level, either at the scene or while being transported to the hospital. (2RT 347-48.) His blood sugar level was determined to be 171 between 7:48 p.m. and 8:28 p.m. the evening of the crash. (2RT 349.) Appellant's blood sugar level was again tested at 8:30 p.m. and measured at 243. (2RT 349-50.)

Following testing at the hospital, it was determined that appellant had no alcohol, or illegal drugs or medication in his system. (2RT 444.) There was also no carbon monoxide in appellant's blood. (2RT 444-45.)

At some point after the bus crash, appellant was interviewed by a television news reporter for Fox 40. (2RT 439.)[3] Appellant told the reporter that he had not been feeling sleepy before the collision. (2RT

---

[3] At trial, a redacted portion of this interview was read to the jury by D.A. Investigator Marks. (2RT 439.)

8

441.) Appellant told the reporter that he believed that there was a leak in the exhaust system that caused him to pass out. (*Ibid.*) Because of the violent movements of the bus before it ran off the road, appellant didn't believe that "anybody have slept through that. . . . I mean any human being would have woken up unless something was – knocked this person out. . . . I'm like God, I had to be knocked out. I had to be totally knocked out to see or to have been experienced all those things that that bus did and not wake up at all." (2RT 441-42.)

After investigation, an expert with the M.A.I.T. team determined that there was no mechanical problem or issue with the bus that contributed to the collision. (See, e.g., 2RT 362-63.) Another expert determined that the roadway conditions and traffic signs of Lone Star Road and the weather conditions at the time of the collision were not contributing causes. (1RT 149, 155, 158.)

Parsons confirmed that it was a Vehicle Code violation for a motorist to fail to maintain a vehicle on the right side of the roadway while driving (Veh. Code, § 21650). (1RT 242-43.) Parsons also testified that it was a violation of the Vehicle Code for a commercial driver to drive when the person is too fatigued to drive safely. (1RT 263.)

## II. The Defense Case.

Arland Soghomonians was a paramedic who responded to the bus crash at about 6:58 p.m. on October 5, 2008. (2RT 453.) Appellant was brought to Soghomonians' ambulance for transport to the hospital. (2RT 454-55.) On route, appellant's blood sugar level was taken, and a measurement of 171 was determined. (2RT 457.) According to Soghomonians, a normal measurement is between 70 and 110. (2RT 457.) However, he noted that "given the situation under . . . a lot of things . . . can

9

cause a sugar to go up, other than the fact he was diabetic." (2RT 457.)
For example, stress can raise a person's blood sugar level. (2RT 457.) In
fact, it is normal to expect a diabetic's blood sugar level to be higher
following a stressful injury. (2RT 457-58.) When medical personnel
attempted to ask appellant questions to assess his injuries, appellant was
unable to describe any of the events immediately surrounding the collision
or the crash itself. (See 2RT 459-60, 468.)

10

## ARGUMENT

In this case involving widespread publicity and strong community interest, the prosecutors took advantage of defense counsel's ineffective assistance to engage in deliberate misconduct in violation of appellant's constitutional rights during closing arguments in order to inflame the passions and prejudices of the jury by personalizing the evidence and by inviting the jury to view this case and the horrific bus crash through the eyes of the victims.   Even if the jurors were able to set aside the prosecutors' misconduct (which they couldn't) in order to objectively determine appellant's guilt or innocence, the jurors were hopelessly handicapped from doing so because they were never instructed on the two defenses upon which defense counsel relied and of which there was substantial evidence.   Even if none of the misconduct or trial error individually was prejudicially, their cumulative effect compels a finding of prejudice pursuant to the federal Due Process Clause and appellant's right to jury trial and right to counsel under the Sixth and Fourteenth Amendments.  This court should reverse the judgment for counts 1 through 11.

## I.    THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT *SUA SPONTE* THE JURY ON CALCRIM NO. 3425 REGARDING THE DEFENSE OF UNCONSCIOUSNESS, THEREBY DEPRIVING APPELLANT OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

### A.    The Evidence And Defense Counsel's Opening Statement And Closing Argument Regarding Accident And Misfortune And Unconsciousness.

In his opening statement, defense counsel informed the jury that the evidence was going to show that appellant was not drinking and not using drugs, and that his blood sugar level was normal at the time of the accident. (Aug.RT 170-71, 173.) Defense counsel concluded by telling the jury, "at the end of this case we believe the evidence is going to amount to either complete acquittal on the basis of accident or misfortune or the lesser charge of ordinary negligence." (Aug.RT 173.)

According to the prosecution's experts, appellant drove the bus and navigated through three curves on Lone Star Road after he exited the freeway at Hann Road, and each of these curves was a significant deviation so as to necessitate a yellow warning sign to warn drivers of the impending turns. (See 1RT 149-51, 180-81.) There was no indication from the experts that appellant had any difficulties or problems negotiating these curves. (See 1RT 180-81.) Moreover, there was no evidence that appellant had any difficulties or problems driving on the freeway from Sacramento after the customer pick-ups. (See *ibid.*)

One of the eyewitnesses testified that bus was not speeding before the collision; rather, it was traveling at a constant speed. (2RT 412.) Indeed, Sergeant Corona did not notice the bus making any unusual movements when he first noticed it as he was approaching it from the

12

opposite direction. (1RT 132.) Only when Corona was about a quarter miles away did Corona notice the bus start to weave on the roadway. (1RT 132.)

According to Corona, the bus was "swaying" and "leaning" from one side to the other as it weaved across the roadway. (See 1RT 133, 136; see also 1RT 238-40 [prosecution expert describing path of bus on roadway].) The bus finally left the roadway when it rolled into the ditch, violently impacted the side of the embankment, spun around, and struck the side of the embankment again. (See 1RT 241-42.)

But Corona never saw any braking by the bus. (1RT 135.) In addition, the prosecution's experts confirmed there was no braking of the bus immediately prior to the collision. (1RT 135, 137, 215.)

After the bus crashed, appellant was questioned by medical personnel when they were trying to assess his injuries. (See 2RT 459-60, 468.) Appellant was unable to recall the events immediately surrounding the collision, but could only remember that he had been driving to the Colusa Casino. (*Ibid.*)

Likewise, Officer Hamann testified that appellant told him during one interrogation that appellant couldn't remember the collision because he "blacked out" before it happened. (2RT 319.) Appellant couldn't recall anything about the collision itself; all he remembered was lying on the ground outside of the bus afterwards, looking at the wrecked bus, and "freaking" out. (2RT 319, 442.) Appellant also made a later statement before trial that he had not been feeling sleepy before the accident and that something must have "totally knocked [him] out" for him "to have . . . experienced all those things that that bus did and not wake up at all." (2RT 442.)

13

After the accident and on route to the hospital, medical personnel tested appellant's blood sugar level and determined that it was 171. (2RT 349.) Appellant's normal blood sugar level range was between 70 and 170, and typically he used insulin to control his blood sugar only when the level rises above 200. (2RT 351.) A defense witness testified that a person who has a blood sugar level of 171 would not be expected to lose consciousness. (2RT 458, 459.) In fact, it is normal for a person's blood sugar level to rise during traumatic injury or stress. (2RT 457-58.)

During his closing arguments, defense counsel referred back to all this evidence. Specifically, he reminded the jury that the evidence showed a "continuous nonaccelerating, nondeceleration of this bus" immediately before the crash. (2RT 540; see 1RT 69-70.) He reminded the jury about appellant's statement to the investigators that appellant couldn't have "slept through" the collision sequence. (2RT 541.) Defense counsel argued that this circumstantial evidence showed that appellant must have been "unconscious through the entire event." (2RT 540.)

Furthermore, if appellant became unconscious immediately before the collision because of some type of coma even though his blood sugar level was around 170, appellant couldn't have anticipated it because his normal level of blood sugar was between 70 and 170. (2RT 347, 541.) As defense counsel explained to the jury:

> If you believe the inferences of the People's case that my client had some kind of diabetic reaction to high blood sugar, and that's why it is that he was unconscious, then you should vote him innocent of all charges, and I'll tell you why. Because at this level of blood sugar he would have absolutely no reason to believe he has a medical problem whatsoever . . . . Let's just say that the stress hadn't increased his blood sugar level, and let's just say it was 171 while he's driving. . . . If he

14

had some completely unexpected reaction to his diabetic condition, then this is an act of God. This is not anything anyone could have predicted at all and he's innocent of the charge.

\* \* \* \*

.... [I]f you believe he's driving down the road and some medical thing that he could not have predicted has caused him to be unconscious, had a blood sugar level that he's been calling normal for years, all right, then that, ladies and gentlemen, is my laymen's definition of an accident. And that is what some insurance companies would call an act of God, but that is certainly not criminal negligence.

(2RT 536-37, 537-38.)

## B.   Despite Evidence Supporting The Instruction And Despite Reliance By the Defense On The Defense of Unconsciousness, The Court Failed To Instruct The Jury *Sua Sponte* On CALCRIM No. 3425.

A court must instruct *sua sponte* on general principals of law that are closely and openly connected with the facts presented at trial. (*People v. Ervin* (2000) 22 Cal.4th 48, 90; *People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) As a corollary to this rule, a trial court must instruct on a particular defense even in the absence of a request "if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148; accord *People v. Rogers* (2006) 39 Cal.4th 826, 887; *People v. Breverman* (1998) 19 Cal.4th 142, 157.) Substantial evidence means evidence which is sufficient to deserve consideration by the jury and which a jury comprised of reasonable persons could conclude the particular facts underlying the instruction existed. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

Unconsciousness is one such defense where the trial court has a *sua sponte* obligation to instruct. (*People v. Rogers*, *supra,* 39 Cal.4th at p.

15

887.) In California, among those persons deemed incapable of committing a crime are individuals who "committed the act charged without being conscious thereof." (§ 26, subd. (4).) Thus, it is well settled that unconsciousness is a complete defense to a criminal charge if not induced by voluntary intoxication. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417; § 26, subd. (4).) As one court explained, "No principle of criminal jurisprudence was ever more zealously guarded than that a person is guiltless if at the time of his commission of an act defined as criminal he has no knowledge of his deed." (*People v. Freeman* (1943) 61 Cal.App.2d 110, 117.)

The defense of unconsciousness is set forth in CALCRIM No. 3425, which provides:

> The defendant is not guilty of < insert crime [s]> if (he/she) acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.] [¶] Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] sleepwalking [,]/ or < insert a similar condition >). [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious. If, however, based on all the evidence, you have a reasonable doubt that (he/she) was conscious, you must find (him/her) not guilty.

As alluded to in CALCRIM No. 3425, unconsciousness "need not rise to the level of a coma or inability to walk or perform manual movements; it can exist where the subject physically acts but is not, at the time, conscious of acting." (*People v. Halvorsen, supra,* 42 Cal.4th at p. 417, citations and quotation marks omitted; accord *People v. Ochoa* (1998)

16

19 Cal.4th 353, 423-24; *People v. Newton* (1970) 8 Cal.App.3d 359, 376.)
Thus, unconsciousness "need not mean that the actor lies still and
unresponsive." (*People v. Ochoa, supra,* 19 Cal.4th at pp. 423-24.)
Instead, a person is deemed "unconscious" if he or she committed the act
without being conscious thereof. (*People v. Haley* (2004) 34 Cal.4th 283,
313; *People v. Rogers, supra,* 39 Cal.4th at p. 887.) As set forth in
CALCRIM No. 3425, an epileptic seizure may be one cause of
unconsciousness. (See *People v. Freeman, supra,* 61 Cal.App.2d at p. 115.)

When a defense is one that negates proof of an element of the
charged offense, the defendant need only raise a reasonable doubt of the
existence of that fact. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 963.)
This is so because the defense goes directly to guilt or innocence. (*People
v. Gonzales* (1999) 74 Cal.App.4th 382, 390.)

In this case, there was substantial evidence that appellant was
unconscious immediately prior to and during the entire collision sequence
of the bus so as to support the unconsciousness defense at trial. As such,
the trial court erred when it failed to instruct *sua sponte* on CALCRIM No.
3425. (See *People v. Rogers, supra,* 39 Cal.4th at p. 887; *People v.
Dominguez, supra,* 39 Cal.4th at p. 1148; *People v. Breverman, supra,* 19
Cal.4th at p. 157; accord *People v. Cox* (1944) 67 Cal.App.2d 166; *People
v. Freeman, supra,* 61 Cal.App.2d at p. 117.)

Even though he was tired that day (2RT 337-38), appellant wasn't
sleepy when he was driving to Colusa before the scene of the collision (see
(2RT 442). Indeed, there was no indication that appellant had any
difficulty or problem driving the bus while on the freeway or when
appellant exited the freeway at Hann Road. (See 1RT 149-51, 180-81.)
Moreover, there was no evidence that appellant had any difficulty or

17

problem driving the bus northbound on Lone Star Road from Hann Road or when appellant negotiated the three distinct curves on Lone Star Road before the collision scene. (See *ibid.*)

But the sudden change in the bus' movement at the beginning of the collision sequence (which Sergeant Corona witnessed) was indicative of appellant's sudden loss of consciousness. As appellant explained, he "blacked" out immediately before the collision and so had no memory of the collision itself or the events immediately prior to the collision, as he told the investigators. (See, e.g., 2RT 319.)[4] The paramedic who treated him at the collision scene confirmed that when appellant was being assessed by medical personnel to determine his injuries, appellant was unable to tell them what happened or immediately prior to or after the collision. (See 2RT 459-60, 468.)

Corona's testimony supported the defense that appellant lost consciousness almost immediately before the collision sequence began. (1RT 132.) When Corona first saw the bus that appellant was driving, the bus had not started weaving and Corona didn't notice any unusual movements. (1RT 132.) The bus started to weave on the road only when the distance closed between Corona's vehicle and the bus to about a quarter mile apart. (1RT 132.) Corona never saw any braking by the bus. (1RT 135.)

In addition, the physical evidence was consistent with appellant's sudden loss of consciousness. The prosecution's accident reconstruction experts testified that there was no evidence of braking by appellant and that

---

[4] According to the investigators, appellant was very cooperative with them and in fact agreed to do two separate interviews. (See, e.g., 1RT 264, 277; 2RT 302, 328, 352.)

18

they did not find any braking skid marks. (See, e.g., 1RT 215-16.) Thus, the physical evidence at the scene, the prosecution's experts, Corona's eye witness observations, and appellant's on-scene statements to medical personnel support appellant's later statements to the investigators that he "blacked" out before the collision and had no memory of the events immediately prior to the collision, the collision itself, or immediately thereafter. (See *People v. Wilson* (1967) 66 Cal.2d 749, 762 [defendant testified he did not recall shooting victims, which was consistent with his statement to police at the time of his arrest]; *People v. Newton* , *supra,* 8 Cal.App.3d at pp. 376-78.)

Moreover, unconsciousness was a defense that defense counsel relied upon, as counsel made explicitly clear in his closing argument. As counsel argued, the evidence showed that appellant was "unconscious through the entire event." (2RT 540.) Counsel reminded the jury of the prosecution's expert testimony about the "continuous nonaccelerating, nondeceleration of this bus" immediately before the collision. (2RT 540; see 1RT 69-70.) Obviously, someone who was conscious would have made some attempts to brake in order to control the bus. (See 1RT 70 [Investigator Hamann's agreement during the preliminary hearing that a "conscious driver might be expected to have applied the brakes sometime during the process"].) Moreover, counsel reminded the jury about appellant's statement to the investigators that appellant couldn't have "slept through" the collision sequence. (2RT 541) In other words, appellant must have been unconscious throughout the entire event.

Consequently, unconsciousness was a complete defense to the charges of gross vehicular manslaughter (§ 192, subd. (c)(1)) and vehicular

manslaughter (§ 192, subd. (c)(2)), and the court should have so instructed the jury pursuant to CALCRIM 3425. (See 2CT 286-88.) In addition, unconsciousness is also a complete defense to a charge of violation of Vehicle Code section 21650, which is the failure to drive upon right half of roadway. (See 2CT 289.) Section 21650 is an infraction that was alleged as the predicate offense for gross vehicular manslaughter and vehicular manslaughter. (See 2CT 286, 88.)

## C.    The Trial Court's Failure To Instruct The Jury *Sua Sponte* On The Defense Of Unconsciousness (CALCRIM No. 3425) Was Prejudicial And Warrants A Reversal.

The trial court's error in failing to instruct the jury on CALCRIM No. 3425 was not harmless. An erroneous failure to instruct on a defense presented by substantial evidence constitutes a denial of the right to have the jury determine every material issue. (*People v. Mayberry* (1975) 15 Cal.3d 143, 157; *People v. May* (1989) 213 Cal.App.3d 118, 128.) Such denial violated appellant's constitutional rights to a jury trial and to adequate instructions on the theories of the defense under the Sixth Amendment and to due process under the Fourteenth Amendment and under article 1, section 15 of the California Constitution. (See, e.g., *Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091, *cert. denied* 540 U.S. 963 (2003); *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 739-40; *United States v. Unruh* (9th Cir. 1988) 855 F.2d 1363, 1372, *cert. denied* 488 U.S. 974 (1988); *United States v. Escobar de Bright* (9th Cir. 1984) 742 F.2d 1196, 1201-02; see also *Sullivan v. Louisiana* (1993) 508 U.S. 275; *United States v. Gaudin* (1995) 515 U.S. 506, 510.)

The error may not be cured by the appellate court weighing the evidence and finding it not reasonably probable that a correctly instructed

20

jury would have found the defendant guilty since they were never given that opportunity. (*People v. May, supra,* 213 Cal.App.3d at p. 128.) The only exception to this rule is where it can be determined the jury necessarily decided the issue adversely to the defendant in another context. (*Ibid.*)

In this case, the jury was not informed of this defense of unconsciousness through any of the other instructions that were actually given. For example, the definition of gross negligence in the instruction for gross vehicular manslaughter (CALCRIM No. 592) (2CT 286) mentions "inattention," "mistake in judgment," "reckless way" but says nothing about a defendant's lack of culpability when "he or she is not conscious of his or her actions" (CALCRIM No. 3425). Likewise, the definition of ordinary negligence in the instruction for gross vehicular manslaughter (CALCRIM No. 593) (2CT 288) refers to "reasonable care" but doesn't explain how unconsciousness is a defense.

In both CALCRIM No. 592 and No. 593, the jury was instructed that appellant's failure to maintain the bus on the right side of the roadway is an infraction that can be used as a predicate to finding appellant guilty of gross or misdemeanor vehicular manslaughter. (See 2CT 286, 288-89.) Of course, if appellant was driving the bus and became unconscious at the point when the bus and Corona's vehicle were within a quarter mile, the bus would inevitable swerve all over the roadway (which is what Corona observed). But the jury was not instructed with CALCRIM No. 3425 and therefore did not know that they had to acquit appellant if they had a reasonable doubt that he was conscious at that point. The trial court's failure to so instruct *sua sponte* was thus prejudicial error. This court should reverse the verdicts and judgment for counts 1 through 11.

21

## II.    THE TRIAL COURT ERRED WHEN IT FAILED *SUA SPONTE* TO INSTRUCT THE JURY ON CALCRIM NO. 3404 REGARDING THE DEFENSE OF ACCIDENT AND MISFORTUNATE, THEREBY DEPRIVING APPELANT OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

### A.    Despite Evidence Supporting The Instruction And Despite Reliance By the Defense On The Accident And Misfortune Defense, The Court Failed To Instruct *Sua Sponte* The Jury On CALCRIM No. 3404.

In addition to the defense of unconsciousness, the trial court failed to instruct *sua sponte* on the defense of accident or misfortune (CALCRIM No. 3404) when the evidence supported such a defense and when defense counsel argued to the jury that the bus collision was a true accident and not the result of criminal negligence. CALCRIM No. 3404 instructs the following for "Criminal Negligence Crimes":

> The defendant is not guilty of *<insert crime[s]>* if (he/ she) acted [or failed to act] accidentally without criminal negligence. You may not find the defendant guilty of *<insert crime[s]>* unless you are convinced beyond a reasonable doubt that (he/she) acted with criminal negligence. *Criminal negligence* is defined in another instruction.

This instruction is based on Penal Code section 26, subdivision five, which provides a defense to "[p]ersons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." As the courts have explained, if the defendant's conduct was accidental, then he or she acted without forming the mental state necessary to make the action a crime. (*People v. Gonzales*, *supra,* 74 Cal.App.4th at p. 390; accord *People v. Lara* (1996) 44 Cal.App.4th 102, 110.)

In this case, defense counsel explicitly informed the jury during his opening statement that he was relying on the defense of "accident or misfortune" and that evidence of this defense at trial would entitle appellant to a "complete acquittal." (Aug.RT 173.) Counsel expanded upon this defense during closing argument: if the jury were to believe the prosecution's argument that appellant had some kind of diabetic reaction, appellant's unconsciousness then must have been a "completely unexpected reaction to his diabetic condition" because appellant's blood sugar level of 171 was only one point above appellant's normal range. (2RT 536-37.) Based on appellant's opening statement and closing arguments, the trial court must have known that appellant was relying on the defense of accident and misfortune, and therefore the court erred when it failed to instruct *sua sponte* on this defense by giving CALCRIM No. 3404. (See *People v. Dominguez*, *supra,* 39 Cal.4th at p. 1148; *People v. Breverman*, *supra,* 19 Cal.4th at p. 157.)

In addition to defense counsel's reliance upon the accident and misfortune defense, there was substantial evidence at trial supporting this defense, and therefore the trial court erred by failing to instruct the jury on CALCRIM No. 3404. (See *People v. Jones* (1991) 234 Cal.App.3d 1303, 1314; *People v. Dominguez*, *supra,* 39 Cal.4th at p. 1148; *People v. Breverman*, *supra,* 19 Cal.4th at p. 157.) During its case in chief, the prosecution introduced appellant's statement that appellant was not sleepy before the collision occurred, that appellant could not possibly have slept through the collision sequence of the bus, and that something instead must have "totally knocked [him] out." (2RT 441-42.)

In addition to evidence that appellant's blood sugar level was 171 when tested soon after the bus crash, there was also evidence that blood

23

sugar levels generally rise during traumatic stress or injury, that appellant's normal range was between 70 and 170, and that appellant needed to use insulin only when the level went above 200. (2RT 349, 351, 457-58.) Moreover, a witness testified that unconsciousness is not normally expected for someone whose blood sugar level is 171. (2RT 458, 459.) Consequently, there was substantial evidence to support instruction on CALCRIM No. 3404 because reasonable jurors could conclude the facts indicative of accident and misfortune existed. (See *People v. Oropeza, supra,* 151 Cal.App.4th at p. 78.)

## B. The Trial Court's Failure To Instruct The Jury *Sua Sponte* On The Defense Of Accident And Misfortune (CALCRIM No. 3404) Was Prejudicial And Warrants A Reversal.

Because there was substantial evidence to support the instruction on accident and misfortune, the failure to give CALCRIM No. 3404 violated appellant's constitutional rights to a jury trial and to adequate instructions on defense theories under the Sixth Amendment and to due process under the Fourteenth Amendment and under article 1, section 15 of the California Constitution. (See, e.g., *Bradley v. Duncan, supra,* 315 F.3d 1091; *Conde v. Henry, supra,* 198 F.3d at pp. 739-40; *United States v. Unruh, supra,* 855 F.2d at p. 1372; *United States v. Escobar de Bright, supra,* 742 F.2d at pp. 1201-02; see also *Sullivan v. Louisiana, supra,* 508 U.S. 275; *United States v. Gaudin, supra,* 515 U.S. at p. 510.) The error may not be cured by the appellate court weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have found the defendant guilty since they were never given that opportunity. (*People v. May, supra,* 213 Cal.App.3d at p. 128.)

In this case, the sole exception to this rule is not applicable, because

24

the jury instructions given did not allow the jury to adequately decide the defense of accident and misfortune adversely to appellant. (See *ibid.*) The instruction for gross vehicular manslaughter states that gross negligence "involves more than ordinary carelessness, inattention, or mistake in judgment" (2CT 286 [CALCRIM No. 592]) but does not explicitly instruct the jury that it must find appellant not guilty if he acted or failed to act accidentally without criminal negligence (see CALCRIM No. 3404). Similarly, the definition of ordinary negligence in the instruction for misdemeanor vehicular manslaughter (§ 192, subd. (c)(2); CALCRIM No. 593]), which discusses failure to use reasonable care, fails to explicitly inform the jury that appellant has a complete defense if he acted or failed to act accidentally (see CALCRIM No. 3404).

Thus, the defense of accident and misfortune was not decided by the jury adversely to appellant under the other instructions actually given in this case. (*People v. May, supra,* 213 Cal.App.3d at p. 128.) As such, the trial court's failure to instruct the jury *sua sponte* on CALCRIM No. 3404 was not harmless error. This court should reverse the verdicts and judgment for counts 1 through 11.

## III. DEFENSE COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT WHEN HE FAILED TO REQUEST THE COURT INSTRUCT THE JURY ON THE DEFENSES OF UNCONSCIOUSNESS (CALCRIM NO. 3425) AND ACCIDENT AND MISFORTUNE (CALCRIM NO. 3404)

Even though the trial court had a *sua sponte* duty to instruct the jury on the defenses of unconsciousness and accident and misfortune, defense counsel was also ineffective when he failed to make an affirmative request for the court to instruct on these defenses by giving CALCRIM No. 3404 and No. 3425. Under both the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution, a criminal defendant has the right to the effective assistance of counsel. (*In re Marquez* (1992) 1 Cal.4th 584, 602; *Strickland v. Washington* (1984) 466 U.S. 668, 685-86.) In other words, a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate. (*In re Marquez, supra,* 1 Cal.4th at p. 602.)

The right to effective assistance of counsel includes the expectation that counsel "will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215, citation omitted.) In particular, "the duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in [her] judgment are necessary to explain all of the legal theories upon which [the] defense rests." (*People v. Sedeno* (1974) 10 Cal.3d 703, 717, fn. 7, overruled on another ground in *People v. Breverman*, 19 Cal.4th at pp. 148-49.)

To establish that his counsel provided ineffective assistance, a defendant must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable

26

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant. (*Strickland v. Washington, supra,* 466 U.S. at pp. 687-88, 694; *People v. Ledesma, supra,* 43 Cal.3d at pp. 216-18.) A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) In this case, defense counsel's failure to request jury instructions on the defenses of unconsciousness and accident and misfortune (which counsel explicitly relied upon at trial) fell below an objective standard of reasonableness, and had counsel done so, there is a reasonable probability that the jury would not have found appellant guilty of gross vehicular manslaughter.

## A. Defense Counsel's Failure To Request The Trial Court Instruct The Jury On The Defenses Of Unconsciousness (CALCRIM NO. 3425) And Accident And Misfortune (CALCRIM NO. 3404) Was Not Objectively Reasonable And Was Not An Informed Or Tactical Decision.

Defense counsel's failure to request jury instructions on the very defenses upon which he relied was not objectively reasonable nor was such failure an informed or tactical decision. (See *People v. Lucas* (1995) 12 Cal.4th 415, 436-37; *People v. Pope* (1979) 23 Cal.3d 412, 425.) Because his failure to act fell below an objective standard of reasonableness, defense counsel was ineffective.

Defense counsel explicitly referred to and relied upon the defenses of unconsciousness and accident and misfortune in his opening statement and closing argument, and therefore there was no simply no satisfactory explanation for his failure to request the court instruct on CALCRIM No. 3404 and No. 3425 so that the jury could understand the defenses upon which he relied. For example, defense counsel told the jury during opening

27

statement that there was no evidence appellant was under the influence of any narcotics or alcohol and that his blood sugar level was only one point above appellant's normal range at the time of the accident. (Aug.RT 170-71, 173.) As counsel told the jury, "at the end of this case we believe the evidence is going to amount to either complete acquittal on the basis of accident or misfortune or the lesser charge of ordinary negligence." (Aug.RT 173.)

At the end of the trial, defense counsel once again referred to the lack of any drugs or alcohol to argue the collision of the bus was an accident, an "act of God," that was not predictable since appellant's blood sugar level was normal at the time of the accident. (See 2RT 536-37, 537-38.) Referring also to appellant's statement before trial that he was not sleepy and could not have slept through the violent collision sequence, defense counsel argued that appellant must have been "unconscious through the entire event." (2RT 540-41.)

Again, there was substantial evidence at trial to support instruction on both defenses of unconsciousness and accident and misfortune. (See pp. 17-19, 23-24, *supra*.) In sum, there simply was no informed or rational tactical reason for defense counsel's failure to insure that the jury was properly instructed on the meaning of the defenses which he relied upon at trial. (See *People v. Lucas*, *supra*, 12 Cal.4th at p. 436-37; *People v. Pope*, *supra*, 23 Cal.3d at p. 425.)

## B. But For Defense Counsel's Failure, There Is A Reasonable Probability The Jury Would Not Have Convicted Appellant Of Vehicular Manslaughter.

If defense counsel had requested the court instructed the jury on the defenses of unconsciousness and accident and misfortune by giving

28

CALCRIM No. 3425 and No. 3404, there is a reasonable probability that the jury would not have convicted appellant of the vehicular manslaughter charges. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-88, 694.) At the very least, instruction on those defenses would have "undermine[d] confidence in the outcome" of the jury's guilty verdicts. (See *id.* at p. 694.)

As both defense counsel and the prosecutor recognized, the main disputed issue at trial was whether, and to what extent, appellant was negligent. (See 2RT 507, 524-25.) Both unconsciousness and accident and misfortune are complete defenses to the charge of vehicular manslaughter. (See *People v. Halvorsen*, *supra*, 42 Cal.4th at p. 417 [unconsciousness defense]; *People v. Freeman*, *supra*, 61 Cal.App.2d at p. 117 [same]; § 26, subd. (4) [same]; *People v. Gonzales*, *supra*, 74 Cal.App.4th at p. 390 [accident and misfortune defense]; accord *People v. Lara*, *supra*, 44 Cal.App.4th at p. 110 [same]; § 26, subd. (5) [same].)

If the jury had been instructed on CALCRIM No. 3404 and No. 3404, there is a reasonable probability that the jury would have had reasonable doubt as to whether the prosecution had met its burden of proof on the vehicular manslaughter charges. Based on the physical evidence and eyewitness observation of Sergeant Corona, appellant had no difficulty or problem driving the bus on the freeway after they left Sacramento, driving on Hann Road after they exited, or navigating the three distinct curves with the yellow warning signs before appellant approached the collision scene. (See 1RT 149-51, 180-81.) Indeed, appellant later stated that he wasn't sleepy when he was driving on this run to Colusa Casino. (See 2RT 441-42.)

Corona didn't notice any problem with the bus until it was only

within a quarter mile of his own vehicle. (See 1RT 132.) It was only at that point that the bus began to swerve on the roadway. (*Ibid.*) Thus, appellant apparently "blacked" out at that point (2RT 319), because the accident reconstruction experts did not find any evidence of braking, such as braking skid marks (see 1RT 215-16), which a person would expect if appellant had been conscious. Moreover, Corona described the bus' movement when it came within a quarter mile of his own vehicle as "violent," with the bus "swaying" and "leaning" from one side to the other. (See 1RT 133, 136; see also 1RT 238-40 [prosecution expert describing path of bus on roadway].)

In addition, the prosecution's accident reconstruction expert testified regarding the bus' violent movements when it rolled into the ditch, impacted the side of the embankment, spun around, and struck the side of the embankment again. (See 1RT 241-42.) As appellant told the investigators later, something must have "totally knocked [him] out" for him "to have been experienced all those things that that bus did and not wake up at all." (2RT 442.) In fact, appellant's blood sugar level was normal for him, and he had not used any drugs or alcohol which would have impaired his driving. (See 2RT 444, 457.)

When the paramedics assessed appellant for injuries after appellant was found outside of the bus on the ground, appellant wasn't able to tell them what happened other than that he had been driving to Colusa. (See 2RT 459-60, 468.) Appellant couldn't tell them about the events immediately leading up to the collision sequence, the collision into the ditch itself, or immediately after the collision. (*Ibid.*)

The evidence thus supported the defense's theory that appellant had a sudden loss of consciousness when his bus came within a quarter mile of

30

Corona's vehicle. This loss of consciousness was not expected, because appellant's blood sugar level soon after the time of the accident was 171, which was only one point above appellant's normal range. (See 2RT 349, 351.) Moreover, a person with a blood sugar level of 171 would not be expected to lose consciousness. (2RT 458, 459.) As defense counsel argued in closing, appellant's unconsciousness was an "unexpected reaction to his diabetic condition" and the resulting collision consequently was an accident, an "act of God." (See 2RT 536-37.) Because of trial counsel's ineffective performance, this court should reverse the guilty verdicts on the manslaughter charges in counts 1 through 11.

31

**IV.  THE PROSECUTORS COMMITTED MISCONDUCT
DURING THEIR CLOSING ARGUMENTS, THEREBY
DEPRIVING APPELLANT OF HIS DUE PROCESS RIGHTS
UNDER THE FOURTEENTH AMENDMENT, AND
DEFENSE COUNSEL'S FAILURE TO OBJECT AND TO
REQUEST TO STRIKE THE COMMENTS WAS
INEFFECTIVE IN VIOLATION OF THE SIXTH
AMENDMENT**

**A.  Voir Dire Argument And Closing Arguments By The
Prosecutors.**

During voir dire, special prosecutor Creg Datig engaged in a long
discussion with a number of different prospective jurors about past car
accidents that they had been involved in and specifics regarding whether
these prospective jurors had been at fault or whether other drivers were at
fault in these accidents. (See Aug.RT 101-13.) For example, Datig asked
one prospective juror if that person thought it was "fair" if the other driver
who struck the prospective juror's car, "who did something negligent or
wasn't careful damaged your property and there was accountability that
attached to that?" (Aug.RT 102-03; see Aug.RT 103-04 [Datig asking
another prospective juror if there was "accountability" by the other at-fault
driver: "In other words, was that person responsible for hitting you,
damaging your property, causing injury to you?"].)

In the middle of this long, extended discussion with various
prospective jurors and Datig, defense counsel objected that Datig was
engaging in "argument" and "personalizing the individual members of the
jury." (Aug.RT 111.) The court overruled counsel's objections, and Datig
continued with his voir dire. (*Ibid.*)

During closing argument, prosecutor John Poyner (the other
prosecutor at trial) recounted to the jury statements made by appellant to
the investigators about appellant's reluctance to complain to Cobb about

32

being tired for fear of losing his job. (2RT 519; see 2RT 338-39.) Next, Poyner used appellant's pay with the bus company to make the following perverse calculations: "A measly $35. About $3 a head for those that died. About 10 cents a person for everybody that was on that bus, but I needed the money." (2RT 519.) Defense counsel didn't object. (See *ibid.*)

In the rebuttal closing argument, prosecutor Datig further attempted to inflame the jury's passions and prejudices by personalizing the evidence for the jury in a number of different ways. Datig started with this example:

> But think about what's at stake with the commercial driver operating a commercial vehicle. Ladies and gentlemen, this isn't a little VW Jetta or something like that or a little Honda. We're talking a huge bus here. ***Think about the last time you were driving and maybe you're in your little private car. I have a small car myself. And a big rig or a bus comes by you on the freeway, and you kind of go, whoa, if that thing hit me, it would be lights out. It's pure common sense, and we all agree that it was fair, and it's appropriate to hold commercial drivers to that higher standard of care. That's what we have here. And that makes sense.***

(2RT 546, emphasis added.) Defense counsel didn't object. (See *ibid.*)

Thereafter in his rebuttal closing argument, Datig summarized the evidence regarding appellant's diabetes and insulin use (2RT 560-62); the amount of sleep appellant had in the 37 hour period focused on by the prosecution (see, e.g., 2RT 549, 557); and appellant's tiredness before beginning his drive to Colusa Casino (see, e.g., 2RT 547, 548, 550-51A, 557-58, 559, 564). Datig also argued that "commercial driver[s]" who transported passengers had a higher duty and obligation than ordinary drivers, specifically comparing them with Datig himself (see, e.g., 2RT 544-45, 548) and the jurors (see, e.g., 2RT 545). (See 2RT 546-47, 552, 557.)

Despite this exhaustive summary of the evidence, Datig still chose to reemphasize the evidence by personalizing the evidence again by offering another hypothetical involving the jurors as well as a separate hypothetical involving the jurors' family members:

> [L]et's talk about it as a practical matter what we expect from people in whose hands we put our lives. We all use commercial transportation at one time or another. Stop and think about it, planes, trains, buses, we all use them. We all trust the people who operate those things for us who have the training, who know the regulations, we all trust them. Think about getting on an airplane, I do it pretty frequently. Usually the pilot kind of stands up there near the cockpit when you're getting on the plane, hi, how are you today, how are you today. ***Stop and think how you would feel if the pilot were standing there going, oh, I've been up for 37 hours, I've only had a couple hours of sleep, I'm hecka-tired. I'm a diabetic and I don't pay attention to my insulin dosages. I guess at them. I don't even know if I tested myself this morning. Come on board. You're getting on that plane. Stop and think about putting a family member or loved one on a bus and that driver tells you, you know, the condition I'm in, I'm going to go drive on the freeway, I've only had a few hours of sleep, a couple hours of sleep in 37 hours, I'm really tired, but come on board. Do you do that to a member of your family?***

(2RT 567-68, emphasis added.) Defense counsel didn't object. (See *ibid.*)

## B.    Defense Counsel Was Ineffective When He Failed To Object And To Request The Court To Strike The Improper And Inflammatory Comments Made By The Two Prosecutors During Closing Arguments.

Under the Sixth Amendment, a defense counsel has a duty to make reasonable investigations of law and facts or to make a reasonable decision that makes particular investigations unnecessary. (*Strickland v. Washington, supra,* 466 U.S. at pp. 690-91.) One "elementary precaution"

is "an investigation of easily discoverable case law." (*In re Greenfield* (1970) 11 Cal.App.3d 536, 544; accord *People v. Soriano* (1987) 194 Cal.App.3d 1470, 1482.) In this case, defense counsel was ineffective because he either was not aware of established legal authorities regarding prosecutorial misconduct, or was aware of these authorities, and yet failed to object when the two prosecutors engaged in a continuing pattern of misconduct beginning at voir dire through closing arguments.

A prosecutor who uses "deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such 'unfairness as to make the resulting conviction a denial of due process'" under the Fourteenth Amendment. (*People v. Friend* (2009) 47 Cal.4th 1, 29, quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) In contrast, under California state law, prosecutorial misconduct is reversible error where the prosecutor uses "deceptive or reprehensible methods to persuade either the court or the jury" and "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Martinez* (2010) 47 Cal.4th 911, 955-56, quoting *People v. Price* (1991) 1 Cal.4th 324, 447 and *People v. Wallace* (2008) 44 Cal.4th 1032, 1071.) Under state law, "a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Friend, supra,* 47 Cal.4th at p. 29; accord *People v. Coffman* (2004) 34 Cal.4th 1, 92.) Misconduct is judged by an objective standard, and the defendant is not required to show bad faith by the prosecutor. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

Although a prosecutor has discretion to make vigorous argument during closing so long as it amounts to fair comment on the evidence, a

35

prosecutor commits misconduct when the arguments become inflammatory or when the prosecutor appeals to the jury's passion and prejudices, such as by appealing to the jury's sympathy for the alleged victim. (*People v. Martinez*, *supra*, 47 Cal.4th 911, at p. 957; accord *People v. Leonard* (2007) 40 Cal.4th 1370, 1406-07; *People v. Sanders* (1995) 11 Cal.4th 475, 527; *People v. Fields* (1983) 35 Cal.3d 329, 363.) It is well settled "that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, reversed on other grounds in *Stansbury v. California* (1994) 511 U.S. 318, citation omitted; accord *People v. Mendoza* (2007) 42 Cal.4th 686, 704 ["it is misconduct to appeal to the jury to view the crime through the eyes of the victim"]; *People v. Leonard*, *supra*, 40 Cal.4th at pp. 1406-07; *People v. Martinez*, *supra*, 47 Cal.4th 911 at p. 957; *People v. Fields*, *supra*, 35 Cal.3d at p. 362; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [misconduct to ask jury to suppose crime had happened to their children].)

From the beginning of the trial during voir dire to the end of trial at their closing arguments, the two prosecutors engaged in conduct that were deceptive and infected appellant's trial with fundamental unfairness so as to constitute a violation of due process under the Fourteenth Amendment. At the very least, their conduct constituted misconduct under state law.

For example, prosecutor Datig consistently inflamed the passions and prejudices of the jury by directing the jury to personalize the evidence and to view the case through the eyes of the victims. Time after time, Datig insisted that the jurors place themselves and their family members and "loved ones" in the shoes of the victims of this horrific bus crash.

36

Datig started during voir dire when he engaged in lengthy examination of a number of prospective jurors regarding any past automobile accidents that they were involved with and questioned them as to whether they thought it was "fair" that they or the other drivers involved were "accountable" for the accidents. (See, e.g., Aug.RT 102-03, 104, 105, 107.) Even though defense counsel objected to this line of questioning as argumentative and as "personalizing" the prospective jurors, the court overruled the objection and allowed Datig to continue. (Aug.RT 111.)

During his rebuttal closing argument, Datig continued with trying to inflame the passions of the jury by inviting the jurors a number of different times to view the case through the eyes of the victims to appeal to the jurors' sympathy for the victims. (See, e.g., *People v. Leonard, supra,* 40 Cal.3d at p. 1407 [misconduct for prosecutor to "ask[] the jurors to imagine the thoughts of the victims in their last seconds of life"]; *People v. Stansbury, supra,* 4 Cal.4th at p. 1057 [misconduct for prosecutor to tell jury to imagine what the 10-year-old victim was "thinking in her last moments of consciousness" and how she "might have begged or pleaded or cried"]; *People v. Fields, supra,* 35 Cal.3d at pp. 361-62 [misconduct for prosecutor to encourage jurors to "think of [themselves]" as the victim and to proceed to describe murder from the victim's perspective].) For instance, Datig invited the jurors to "[t]hink about the last time you were driving and maybe you're in your little private car. . . . And a big rig or a bus comes by you on the freeway, and you kind of go, whoa, if that thing hit me, it would be lights out." (2RT 546.) This hypothetical was a transparent attempt to try to inflame the passions of the jury and to frighten the jurors, effectively dissuading them from an objective determination of the evidence before them. (See *People v. Medina, supra,* 11 Cal.4th at pp.

37

759-60.)

Later on in his rebuttal closing argument, Datig continued with this improper line of argument when he again invited the jurors to imagine another hypothetical that had almost no relevance to this case but which obviously served to attempt to inflame the jurors' passions and prejudice and to force them to view the case through the victims' eyes. (2RT 567-68.) Datig invited the jurors to imagine that they were going to get on an airplane. He continued, "Stop and think how you would feel if the pilot were standing there going, oh, I've been up for 37 hours, I've only had a couple hours of sleep, I'm hecka-tired. I'm a diabetic and I don't pay attention to my insulin dosages. I guess at them. I don't even know if I tested myself this morning. Come on board. You're getting on that plane." (2RT 567.)

Not content with encouraging the jurors to view the case through the eyes of the victims, Datig invited the jurors to imagine that their own "family member" or "loved one" were the victims. (See *People v. Pensinger, supra,* 52 Cal.3d at p. 1250.) Datig encouraged the jurors to imagine the following: "Stop and think about putting a family member or loved one on a bus and that driver tells you, you know, the condition I'm in, I'm going to go drive on the freeway, I've only had a few hours of sleep, a couple hours of sleep in 37 hours, I'm really tired, but come on board. Do you do that to a member of your family?" (2RT 567-68.)

Datig's comments constituted prosecutorial misconduct under established California authorities. The invitations posed by Datig to the jurors to view themselves and, separately, to view their family members and loved ones in the shoes of the victims served to inflame the jurors, to appeal to the jurors' sympathy for the victims, and to encourage jurors to

38

depart from their duty to view the evidence objectively. (See *People v. Simington* (1993) 19 Cal.App.4th 1374, 1379; *People v. Pensinger, supra,* 52 Cal.3d at p. 1250.)

In addition to Datig's improper comments, prosecutor Poyner also sought to inflame the passions and anger of the jurors by morbidly calculating the monetary value of the deceased and injured passengers using appellant's pay of $35 per day as the basis (1RT 65): "A measly $35. About $3 a head for those that died. About 10 cents a person for everybody that was on that bus, but I needed the money." (2RT 519.) Poyner's grisly comment was of no relevance to the evidence, nor to the prosecution's burden of proving the elements of the vehicular manslaughter charges. His improper comments sought only to arouse the jury's sense of retribution and passions; certainly, it had nothing to do with furthering the jury's duty of "objective determination of guilt." (See *People v. Stansbury, supra,* 4 Cal.4th at p. 1057.) As such, these statements by prosecutor Datig and prosecutor Poyner constituted misconduct.

Despite these multiple instances of misconduct by the two prosecutors during their closing and rebuttal closing arguments, defense counsel failed to make any objection or request for the court to strike these comments. As such, defense counsel was ineffective. (See *People v. Williams* (1997) 16 Cal.4th 153, 221 [reviewing merits of prosecutorial misconduct argument under ineffective assistance of counsel claim]; *People v. Wharton* (1991) 53 Cal.3d 522, 567 [same].)

Defense counsel should have been aware, or should have made himself aware, of this "easily discoverable case law" (*In re Greenfield, supra,* 11 Cal.App.3d at p. 544) about prosecutorial misconduct, especially since the California Supreme Court has emphasized that it is "*settled*" that a

39

prosecutor commits misconduct when the prosecutor "appeal[s] to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial" because "an appeal for sympathy for the victim is out of place during an objective determination of guilt." (*People v. Stansbury*, *supra*, 4 Cal.4th at p. 1057, emphasis added; accord *People v. Mendoza*, *supra*, 42 Cal.4th at p. 704; *People v. Leonard*, *supra*, 40 Cal.4th at pp. 1406-07; *People v. Martinez*, *supra*, 47 Cal.4th 911 at p. 957; *People v. Fields*, *supra*, 35 Cal.3d at p. 362; *People v. Pensinger*, *supra*, 52 Cal.3d at p. 1250.) By failing to make himself knowledgeable about this easily discoverable case law, defense counsel's performance fell below an objective standard of reasonableness and therefore was ineffective.

It appears, though, that defense counsel may have been aware about this well settled area of law regarding prosecutorial misconduct, based on counsel's objection during voir dire. When prosecutor Datig's questioned the prospective jurors about their personal experiences with automobile accidents, defense counsel objected on the ground that Datig was "*personalizing* the individual members of the jury." (Aug.RT 111, emphasis added.) Yet, defense counsel failed to object during closing arguments to any of the acts of misconduct by the two prosecutors, even though those acts were much more blatant and obvious. Because he failed to object and to make a motion to strike, defense counsel's performance fell below an objective level of reasonableness.

Defense counsel's failure to act was neither an informed or rational tactical decision. (See *People v. Lucas*, *supra*, 12 Cal.4th at pp. 436-37; *People v. Pope*, *supra*, 23 Cal.3d at p. 425.) Datig attempted to inflame the anger and passions of the jury not just once, but three times during his rebuttal closing arguments, when Datig encouraged the jurors to place

themselves in the shoes of the victims and then invited them to place their family members and loved ones in the shoes of the victims. (See 2RT 546, 567-68.)

Datig obviously sought to invoke the jury's sympathy for the victims and to arouse their anger against appellant. Prosecutor Poyner contributed to this misconduct when he improperly and crudely calculated the worth of each of the deceased and seriously injured victims based on a percentage of appellant's daily pay. (See 2RT 519.) By failing to make any objection to the two prosecutors during their closing arguments, defense counsel failed to mitigate or prevent the prosecutors' attempts to improperly indoctrinate the jury by appealing to their anger, passions, and prejudices.

## C.   But For Defense Counsel's Ineffective Performance In Failing To Object To, And To Make A Motion To Strike, The Acts Of Misconduct By The Two Prosecutors, There Is A Reasonable Probability The Jury Would Not Have Convicted Appellant Of The Vehicular Manslaughter Charges.

In assessing prejudice, this court should consider the cumulative effect of the prosecutors' misconduct because the number and gravity of incidents "raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill* (1998) 17 Cal.4th 800, 845.) In assessing the effect of the misconduct, this court must also factor in the "special regard the jury has for the prosecutor." (*People v. Bolton* (1979) 23 Cal.3d 208, 213; accord *People v. Hill, supra,* 17 Cal.4th at p. 823 [prosecutor's misconduct during closing argument "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence"].)

The acts of misconduct by the two prosecutors resulted in a

41

fundamentally unfair trial for appellant and thus a violation of his due process rights under the Fourteenth Amendment. (See *People v. Friend, supra,* 47 Cal.4th at p. 29; *Darden v. Wainwright, supra,* 477 U.S. at p. 181.) Because the misconduct infringes upon appellant's federal constitutional rights, this court should assess the cumulative effect of the acts of misconduct under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24.) (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386 fn.9.)

Under this standard, the state must prove beyond a reasonable doubt that the error did not contribute to the verdicts obtained in order for the error to be considered harmless. (*Chapman v. California, supra*, 386 U.S. at p. 24.) The burden is on *the state* to demonstrate that the error was harmless beyond a reasonable doubt. (*People v. Stritzinger* (1983) 34 Cal.3d 505, 520.)

Here, respondent cannot demonstrate that the acts of misconduct by the two prosecutors were harmless beyond a reasonable doubt. This trial was obviously a serious case, involving eleven deaths and over twenty other individuals seriously injured. Given the gravity and the seriousness of the bus crash, it was not surprising that there was much publicity concerning appellant's case. (See, e.g., 1CT 5-7, 16, 22-37, 54-55, 84-86, 90-91 [media requests to broadcast or record court proceedings from this case, including associated court orders]; Aug.CT 1-29, 34-48 [same].)

Indeed, the trial court acknowledged during voir dire that "pretty much everybody" on the panel had read something in the newspaper about the charged incident. (See Aug.RT 60; see Aug.RT 61-70.) As defense counsel noted during voir dire, "We very rarely, and, perhaps, never have had an entire prospective panel raise their hands when we've asked if they've read about a case. But on this case everybody has." (Aug.RT 157.)

It was also apparent from voir dire that the community where the collision occurred, and where the trial was held, was a small, close-knit community. For example, many of the prospective jurors knew one another (see, e.g., Aug.RT 21, 25, 26);[5] some of the prospective jurors were co-workers or worked for one another (see, e.g., Aug.RT 73, 74, 76); a few prospective jurors knew prosecutor Poyner socially (see Aug.RT 17-19); and a few others knew prosecution witness Corona socially (see Aug.RT 48-50). In fact, several of the prospective jurors had been involved in the rescue and recovery efforts following this very same bus crash (see, e.g., Aug.RT 5, 63, 94), and at least one prospective juror was working in the fields nearby when the collision occurred (Aug.RT 64). In contrast, appellant was the outsider who wasn't from and didn't live in this community. (See 2RT 305.)

Given this background, the prosecutors' improper attempts to inflame the jury's passions and prejudices and attempts to invoke the jury's sympathy for the victims by encouraging the jury to view the evidence through the eyes of the victims had significant prejudicial impact. Poyner's morbid calculation of each death and each injured victim had no purpose other than to portray appellant as a villain and to incite the jurors' anger towards him. Datig's improper comments to invite the jurors to place themselves and their family members and loved ones in the shoes of the victims had the goal and effect of clouding the jurors' objective consideration of the evidence by whipping up the passions of the jurors. The state cannot show that the numerous acts of prosecutorial misconduct were harmless beyond a reasonable doubt under *Chapman*. As such, this

---

[5] One prospective juror claimed to know "[a]bout half the jury" in this person's own words. (Aug.RT 22.)

court should reverse the verdicts and judgments on counts 1 through 11.

Even if this court were to determine that the misconduct violated only California law and thus the state standard of prejudice applied, there is still a reasonable probability that a result more favorable to defendant would have been reached in the absence of the misconduct. (See *People v. Stansbury, supra,* 4 Cal.4th at p. 1057; *People v. Pensinger, supra,* 52 Cal.3d at p. 1250.) For example, prosecutor Datig's improper comments and his hypotheticals were not brief and isolated; in fact, he repeatedly made three separate appeals to the jury's passions and prejudices in his rebuttal closing arguments (See *People v. Mendoza, supra,* 42 Cal.4th 686, 704 [prosecutor's misconduct not prejudicial where "his comments were brief and he did not return to the point"]; *People v. Pensinger, supra,* 52 Cal.3d at p. 1250 [prosecutor's remark not prejudicial because it "was an isolated one and it was not repeated"]; *People v. Simington, supra,* 19 Cal.App.4th at p. 1380 [same].)

For example, Datig's first hypothetical was when he encouraged the jurors to imagine themselves in a "little private car" and imagine that a "big rig or a bus comes by you on the freeway, and . . . [that] if that thing hit me, it would be lights out." (2RT 546.) These comments served no purpose other than to improperly strike fear into the jurors and certainly in no way can be construed as "fair comments on the evidence" (*People v. Martinez, supra,* 47 Cal.4th 911, at p. 957) since the collision here was a single vehicle collision and didn't involve any "little private car" (2RT 546).

In Datig's subsequent inflammatory example, Datig invited the jurors to imagine themselves getting on an airplane and explicitly asked the jurors to "[s]top and think how you would feel if the pilot were standing there going, oh, I've been up for 37 hours, I've only had a couple hours of

44

sleep, I'm hecka-tired. I'm a diabetic and I don't pay attention to my insulin dosages. I guess at them. I don't even know if I tested myself this morning. Come on board." (2RT 567.) Again, this case involved a single vehicle collision, and thus Datig's hypothetical regarding airplanes could not be interpreted in any way as a fair comment on the evidence. (See *People v. Martinez, supra,* 47 Cal.4th 911, at p. 957.)

In fact, before Datig had made this second set of improper comments, Datig had already summarized to the jury the evidence regarding appellant's diabetes and insulin use (2RT 560-62); the amount of sleep appellant had in the 37 hour period focused on by the prosecution (see, e.g., 2RT 549, 557); and appellant's tiredness before beginning his drive to Colusa Casino (see, e.g., 2RT 547, 548, 550-51A, 557-58, 559, 564). Datig also had already argued that "commercial driver[s]" who transported passengers had a higher duty and obligation than ordinary drivers, specifically comparing them with Datig himself (see, e.g., 2RT 544-45, 548) and the jurors (see, e.g., 2RT 545). (See 2RT 546-47, 552, 557.) In other words, Datig's comments and hypothetical encouraging the jurors to imagine themselves on an airplane with the pilot as described had no relevance other than to inflame the jurors' passions and fears and to evoke sympathy for the victims in this case. (See *People v. Riggs* (2008) 44 Cal.4th 248, 302.) Certainly, he had already exhaustive gone over the evidence with the jury in support of his argument for conviction.

And even more egregious (if possible), Datig next invited the jurors to imagine "putting a family member or loved one on a bus" and for that bus driver to "tell[] you, you know, the condition I'm in, I'm going to go drive on the freeway, I've only had a few hours of sleep, a couple hours of sleep in 37 hours, I'm really tired, but come on board. ***Do you do that to a***

45

*member of your family?*" (2RT 567-68, emphasis added.) Certainly, the last sentence of this last example was squarely directed to evoking an improper emotional response from the jurors by forcing them to view this case and the tragic bus crash from the viewpoint of their family members and "loved ones" being in the shoes of the victims. Like the second hypothetical with the airplane, Datig's comments about the jurors' family members and "loved ones" were not fair comments on the evidence, because Datig had already just exhaustively summarize the evidence to the jury. This last example, just like the example with the airplane pilot, had no purpose other than to invoke an improper emotional response from the jury and to encourage them to disregard their duties to objectively determine appellant's guilt or innocence from the evidence presented at trial. (See *People v. Martinez, supra,* 47 Cal.4th 911, at p. 957.)

During his opening closing argument, Poyner's crude and morbid monetary calculation of the worth of the deceased and injured passengers had set the stage for Datig's more detailed and more numerous improper comments that appealed to the jury's passions, prejudices, and fears. In conjunction with the wide spread publicity of this case, the aggregate prejudicial effect of these acts of misconduct was greater than the sum of the prejudice of each act standing alone. (See *People v. Hill, supra,* 17 Cal.4th at p. 845.) Specifically, the aggregate effect of these acts of misconduct by the two prosecutors was to deny appellant's his due process rights under the Fourteenth Amendment.

Certainly, there is a reasonable probability that a result more favorable to defendant would have been reached in the absence of these acts of misconduct, and thus this court should reverse the judgment because of this prosecutorial misconduct even under the state standard of error.

46

(See *People v. Stansbury, supra,* 4 Cal.4th at p. 1057; *People v. Pensinger, supra,* 52 Cal.3d at p. 1250.)  Under the similar *Strickland* test for ineffective assistance, there is a reasonable probability that the results of appellant's trial would have been more favorable to appellant had defense counsel objected to, and made a motion to strike, these numerous improper statements of misconduct by the two prosecutors.  (See *Strickland v. Washington, supra,* 466 U.S. at pp. 687-88, 694; *People v. Ledesma, supra,* 43 Cal.3d at pp. 216-18.)  This court should reverse the verdicts and judgment for counts 1 through 11.

## V.   THE CUMULATIVE EFFECTS OF THE PROSECUTORIAL MISCONDUCT AND THE ERRORS AT TRIAL VIOLATED APPELLANT'S RIGHT TO DUE PROCESS, RIGHT TO COUNSEL, RIGHT TO JURY TRIAL AND RIGHT TO ADEQUATE INSTRUCTIONS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

Even if this court were to conclude that none of the misconduct and errors identified individually warrant reversal, their cumulative effect compels a finding of prejudice pursuant to the federal Due Process Clause and appellant's right to jury trial and right to counsel under the Sixth and Fourteenth Amendments. (See *Chambers v. Mississippi* (1973) 410 U.S. 284, 302-03.) In other words, each of these errors must be evaluated not only in reference to its independent effect but in relation to its cumulative effect with the other errors, and this principle applies to multiple federal constitutional errors (e.g., *Derden v. McNeel* (5th Cir. 1991) 938 F.2d 605, 610; *Thomas v. Hubbard* (9th Cir. 2002) 273 F.3d 1164, 1179-80) as well as to a combination of federal constitutional errors and state law errors (*Chambers v. Mississippi, supra,* 410 U.S. at pp. 302-03; *People v. Rodriguez* (1981) 109 Cal.App.3d 457, 469-70).

Courts must evaluate the cumulative prejudicial effects of these errors, because considered together, such errors may create "a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*People v. Hill, supra,* 17 Cal.4th at p. 847.) Stated another way, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill, supra,* 17 Cal.4th at p. 844, citations omitted.)

In this case, even if this court were to determine that the errors identified were harmless individually, the combined effect of these errors

48

nevertheless rendered appellant's defense "far less persuasive than it might have been" (*Chambers v. Mississippi* (1973) 410 U.S. at p. 294), and therefore had a "substantial and injurious effect or influence on the jury's verdict" (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 637), thereby violating appellant's due process rights. (See *Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 927-28.)

Again, appellant's jury was chosen from a small, close-knit community (see, e.g., Aug.RT 17-19, 21, 25, 26, 48-50 73, 74, 76), and because of the gravity and seriousness of the bus crash and resulting deaths, all of the jurors had heard or been involved in this case in some form or another before trial (see, e.g., Aug.RT 5, 60-70, 94, 157.) In contrast, appellant was the outsider who wasn't from and didn't live in this community. (See 2RT 305.) The two prosecutors were well aware of this emotionally charged backdrop by the time that they argued their closing arguments when they improperly appealed to this jury's passions and prejudices and when they improperly encouraged these jurors to experience the bus crash and to view the case and the accident through the eyes of the victims. They were well aware of this backdrop when they invited the jurors to imagine that their family members and "loved ones" had been on appellant's bus. They were well aware when they appealed to the jury's anger and passions by calculating the monetary value of the deceased and injured, when they told the jury, "About $3 a head for those that died. About 10 cents a person for everybody that was on that bus, but I needed the money." (2RT 519.)

Appellant was thus confronted with two overzealous prosecutor but was severely handicapped by the failure of his defense counsel to request (and the failure of the trial court to instruct *sua sponte*) jury instructions on

the only two defenses that counsel relied upon at trial, unconsciousness and accident and misfortune. Thus, even if the jurors were able to view the evidence objectively, despite the prosecutorial misconduct during closing arguments, then jurors still were bereft of jury instructions that would have allowed them to consider adequately these two complete defenses which had support in the evidence and which were explicitly relied upon by defense counsel.

Because of the cumulative effects of the trial errors and of the prosecutorial misconduct, this court should reverse the verdicts and judgments in counts 1 through 11.

# EXHIBIT B

1    accountable if they drove a vehicle under

2    circumstances that were dangerous to others'

3    safety.  And there's a simple word that

4    describes doing something that's dangerous to

5    other people's safety.  It's really simple, real

6    common sense.  That word is reckless, being

7    reckless with other people's safety.  There's no

8    question that that happened here.

9         Now, we may have all driven at one

10   time or another when we were a little bit tired.

11   I define that as something that happened to me

12   just the other night, when I'd gotten up at

13   about 6:00 o'clock in the morning to come to

14   work, and then after work I went out to dinner,

15   and at about 9:30 that night I drove home, and I

16   thought to myself, boy, it's going to be good to

17   get home, it's going to be good to sit down in

18   front of the television.

19         But what we have here, ladies and

20   gentlemen, is very, very different from that.

21   It's very, very different from somebody driving

22   home, winding down the window, maybe turning up

23   the radio because you want to make sure you stay

24   alert.  And the reason it's so different, ladies

25   and gentlemen, is because I am not a commercial

000544

1   driver with 12 to 13 years of experience.  I am

2   not a commercial driver who's familiar with

3   regulations that say you can't drive when you're

4   fatigued, it's unsafe.  I am not a commercial

5   driver who for compensation takes the lives of

6   41 people into my hands when I've had three or

7   four hours of sleep in 37 hours.  That's not

8   something that all of us have done.  I think I'm

9   on pretty secure ground when I say that's

10  something that none of us have done.  And why?

11  Because it's unreasonable, it's unsafe, it's

12  reckless.  That's the facts, folks, of this

13  case.

14          Now, Investigator Parsons told us what

15  it takes to get a Class A license.  We know what

16  it took for the Defendant to get a Class A

17  license.  He had to go to Western Truck Driving

18  School, he had on-the-job training, the D.M.V.

19  requires a written test, it requires a driving

20  test, it requires a pretrip inspection.  And in

21  fact he told us I've driven them all, every kind

22  of truck, hazmat, rigs, he's driven them all.

23  He knows what a commercial driver is supposed to

24  do.

25          And when we talk about common sense,        000545

```
 1    think about it.  What could be a more common
 2    sense rule than to say commercial driver, if
 3    you're too fatigued to drive safely, you're not
 4    supposed to drive.  That makes sense for any
 5    driver, if you're too fatigued to drive safely
 6    that you shouldn't drive.  But think about
 7    what's at stake with the commercial driver
 8    operating a commercial vehicle.  Ladies and
 9    gentlemen, this isn't a little VW Jetta or
10    something like that or a little Honda.  We're
11    talking a huge bus here.  Think about the last
12    time you were driving and maybe you're in your
13    little private car.  I have a small car myself.
14    And a big rig or a bus comes by you on the
15    freeway, and you kind of go, whoa, if that thing
16    hit me, it would be lights out.  It's pure
17    common sense, and we all agree that it was fair,
18    and it's appropriate to hold commercial drivers
19    to that higher standard of care.  That's what we
20    have here.  And that makes sense.
21               And in this case we don't have just
22    any commercial vehicle, we have a bus, a bus
23    with passengers on board.  People who have
24    entrusted their safety to the man behind the
25    wheel because there's nothing they can do about
```

000546

1    whatever happens.  Okay.  They can't reach over
2    and nudge the driver and say, hey, wake up,
3    you're falling asleep.  They can't, say, go up
4    and talk to the driver and say, hey, are you
5    really okay to drive.  Their safety is in his
6    hands, and it makes sense that if he disregards
7    that safety, that that's reckless.  Think about
8    that.

9              Now, we know that the Defendant in
10   this case was familiar with that route.  We know
11   he was.  Look at his statements to Investigator
12   Simmon Hamann.  He told Investigator Hamann, I'm
13   sure you remember this testimony when the
14   Investigator asked him, well, what do you do if
15   you're driving a commercial vehicle and you get
16   fatigued, what do you do?  I pull over.  I've
17   done it many times.  Stop and think, did he know
18   he was fatigued?  We'll talk about this more
19   later, but he told us at least four times, and
20   he told us he was getting more tired and more
21   tired as this long period of time went on.  So
22   he knew he was fatigued.  He knew what the right
23   thing to do was.  Pull over, I've done it many
24   times.  Did he do it?  No, he didn't.  No, he
25   didn't.  We also know that he made a conscious

000547

 1   choice to disregard the rule that he shouldn't
 2   drive while he was fatigued.
 3        And it's interesting because counsel
 4   told you, well, gosh his boss, the owner of the
 5   bus trusted him to drive.  Now, why, why did
 6   that happen?  Well, we know why it happened,
 7   because what did the Defendant say to
 8   Investigator Hamann?  He said, man, I was
 9   hecka-tired, but I didn't complain about it.  I
10   didn't complain about it too much because I
11   needed that money and I wanted that job.  I'll
12   read you the exact quote in just a minute.
13        Okay.  It's one thing today, I could
14   go in to Mr. Poyner, and in fact I -- I walked
15   in to him this morning.  I said, you know, I
16   feel kind of tired.  Okay.  Now, contrast that
17   with, you know, I'd like to go out for a drive
18   with you, and man, I am so tired I don't think I
19   can keep my eyes open behind the wheel, I'm
20   hecka-tired.  That's not what Mr. Cobb was told,
21   not at all.
22        And to make matters worse, if the
23   Defendant had pulled over, if the Defendant said
24   whoa, wait a second, this is enough is enough,
25   and they'd done the right thing, the safe thing

000548

1    But he made the choice to drive that
2   bus with 41 passengers on it who were his
3   responsibility.  And that was a choice, that was
4   not a mistake, it wasn't an accident he was
5   driving that bus, it was his choice.

6    And with the tragic results that came
7   from that choice comes accountability.  And
8   there can be no doubt about accountability in
9   this case.  Now, the law guides us about what
10   level of accountability is appropriate in this
11   case.  And now you as the jurors have a choice.
12   And here's your choice, do you follow the law
13   and the evidence in this case and hold the
14   Defendant fully accountable for the choice he
15   made to disregard the high risk of danger he was
16   posing to his passengers by choosing to drive
17   when he was so tired he literally couldn't see
18   straight?  That's gross negligence.  Or do you
19   compromise?  Do you compromise by saying to this
20   Court, these victims, do you compromise by
21   saying that a professional driver who acts this
22   way, a professional driver who acts this way is
23   just careless?  That's just careless.  And
24   that's ordinary negligence, ladies and
25   gentlemen.  That would be ordinary negligence if

000552

1    you said what the Defendant did in this case,

2    that's just careless.  Because that's what

3    ordinary negligence is.  The judge told you that

4    in the jury instructions.

5         I don't think it will be necessary to

6    dim the lights.  We'll take a look as it warms

7    up here.  Thank you, sir.

8         Now, let's take a look at the law and

9    the law that shows us that there's really only

10   one choice that is fair, that makes sense and

11   that follows the law in this case.

12        MR. SMITH:  Your Honor, I do make an

13   application and that is the jury should be

14   reminded that no instruction is more important

15   or more significant than any other instruction.

16   That is part of the Court's instructions.

17        THE COURT:  That was in the

18   instructions, all right.  Thank you.

19        MR. DATIG:  Now, let's take a look at

20   the actual law that Judge Thompson read to you

21   that applies to this case.  This is gross

22   vehicular manslaughter, this is what's charged

23   in Counts 1 through 11.  Okay.  And as you can

24   see, these are the elements of the crime.  Maybe

25   you can't see because I'm standing in front of

1    you, so let me get over here.

2            As you can see, these are the elements

3    of the crime.  Okay.  This is what you have to

4    find that the People proved.  First, the

5    Defendant drove a vehicle.  Second, that while

6    driving that vehicle the Defendant committed an

7    infraction or otherwise lawful act that might

8    cause death.  Third, the Defendant committed an

9    infraction or otherwise lawful act that might

10   cause death with gross negligence.  And fourth,

11   the Defendant's grossly-negligent conduct caused

12   the death of another person.

13           Well, there's no question about Number

14   1 and Number 4, so let's take a look at Number 2

15   and Number 3.  While driving the vehicle he

16   committed an infraction or an otherwise lawful

17   act that might cause death, and here's the

18   infraction right here.  He committed the

19   following infraction, failure to maintain a

20   vehicle on the right side of the roadway.

21           Now, do we know that that happened?

22   Well, Judge Thompson told you, what do we have

23   to prove to -- prove to you that infraction?

24   Simply that he was driving a vehicle and he

25   didn't maintain it on the right side of the

000554

1    roadway.  We know that.  We know that from

2    Sergeant Corona.  That was the first thing

3    proven in this case.  We know it from Sergeant

4    Corona, he was over on my side of the street

5    coming right at me.  And we also know it from

6    the CHP reconstruction.  So there is no question

7    that that has been proved.

8              But we took it further.  We gave you

9    something else too.  Or otherwise lawful act

10   that might cause death.  Now, what that says

11   right here, the People also alleged the

12   Defendant committed the following otherwise

13   lawful act that might cause death, driving while

14   fatigued.  Driving is a lawful act if you're

15   properly licensed, and we know he was.  He was

16   an experienced commercial driver, but driving

17   while fatigued, as we certainly know from this

18   case, is an otherwise lawful act that might

19   cause death.  So we know that both these things

20   are true.  Proven without question he committed

21   an infraction, and he committed an otherwise

22   lawful act that might cause death, driving while

23   fatigued.  That's uncontroverted, it's not

24   questioned.

25              Now, did he do it with gross

000555

```
 1   negligence?  Well, let's take a look at what
 2   gross negligence is.  And we see that right here
 3   in this portion of the instruction.  First the
 4   instruction tells you, the law tells you just as
 5   Judge Thompson read it to you what gross
 6   negligence is not.  Gross negligence involves
 7   more than ordinary carelessness, inattention or
 8   mistake in judgment.  A person acts with gross
 9   negligence when he or she acts in a reckless way
10   that creates a high risk of death or great
11   bodily injury.  Okay.  Well, again, we know
12   there was a high risk of death or great bodily
13   injury here in this case.  We have 11 dead
14   people and 23 injured, and a reasonable person
15   would have known that acting that way would
16   create such a risk.  In other words, a person
17   acts with gross negligence when the way he or
18   she acts is so different from how an ordinarily
19   careful person would act in the same situation
20   that his or her act amounts to disregard for
21   human life.
22           Okay.  Now, what about that?  Well,
23   first of all, does an ordinarily careful person
24   know and understand that driving a big
25   commercial vehicle, okay, you don't have to be a
```

000556

```
 1    professional driver to understand this one.  I'm
 2    not.  But does an ordinarily careful person know
 3    that when you get behind the wheel of a large
 4    commercial vehicle and you've got 41 passengers
 5    with you, that driving when you've only had
 6    three or four hours of sleep in a 37-hour period
 7    of time poses a high risk of danger?  Do
 8    ordinary reasonable people know that?  You'd
 9    have to.  I mean, stop and think about it.  When
10    is the last time you went 37 hours with three or
11    four hours of sleep and how did you feel?  So
12    clearly a reasonable person would know that
13    carries with it a high risk of death or great
14    bodily injury.
15          Now, this here, ordinary carelessness,
16    inattention or mistake in judgment, that's what
17    simple negligence is.  That's what ordinary
18    negligence is.  That's the lesser crime here.
19    Okay.  Is that what we have here, inattention,
20    he kind of wasn't paying attention while he
21    drove the bus and that's why he went all over
22    the place and crashed headlong into a ditch and
23    doesn't know what happened?  No mistake in
24    judgment.  Was he mistaken about how tired he
25    was?  No.  He told us four times, I was tired,
```

1  say, actually articulate to other people, hey,

2  shouldn't do this.  It makes sense there's a

3  different level of accountability.

4          And when we talk about sense, let's

5  talk -- let's talk about it as a practical

6  matter what we expect from people in whose hands

7  we put our lives.  We all use commercial

8  transportation at one time or another.  Stop and

9  think about it, planes, trains, buses, we all

10  use them.  We all trust the people who operate

11  those things for us who have the training, who

12  know the regulations, we all trust them.  Think

13  about getting on an airplane, I do it pretty

14  frequently.  Usually the pilot kind of stands up

15  there near the cockpit when you're getting on

16  the plane, hi, how are you today, how are you

17  today.  Stop and think how you would feel if the

18  pilot were standing there going, oh, I've been

19  up for 37 hours, I've only had a couple hours of

20  sleep, I'm hecka-tired.  I'm a diabetic and I

21  don't pay attention to my insulin dosages.  I

22  guess at them.  I don't even know if I tested

23  myself this morning.  Come on board.  You're

24  getting on that plane.  Stop and think about

25  putting a family member or loved one on a bus

000567

1     and that driver tells you, you know, the

2     condition I'm in, I'm going to go drive on the

3     freeway, I've only had a few hours of sleep, a

4     couple hours of sleep in 37 hours, I'm really

5     tired, but come on board.  Do you do that to a

6     member of your family?

7             Ladies and gentlemen, you're the voice

8     of the community here.  What you say and what

9     you decide is the community's opinion.  That's

10    why we chose jurors from the community.  And so

11    your decision in this case tells us what we have

12    a right to expect from the people in whose hands

13    we put our lives.  The victims in this case,

14    they deserve better.  I would urge you to hold

15    the Defendant fully accountable, find him guilty

16    of gross vehicular manslaughter with great

17    bodily injury as charged.  Thank you very, very

18    much.

19            MR. SMITH:  Your Honor, before we

20    charge the jury may we have a side bar?

21            (Bench conference, unreported)

22            THE COURT:  Ladies and gentlemen, one

23    final instruction that I wish to give and

24    that is that lesser included offenses are

25    required to be given by the Court.  The Court is

000568